**AERIAL SPRAYERS, INC., Appellant,**

v.

**Raymond KING et al., Appellees.**

**No. 6790.**

Court of Civil Appeals of Texas.

Amarillo.

Oct. 20, 1958.

Kilgore & Kilgore, Dallas, Watson & Watson, Stamford, for appellant.

Bullington, Humphrey, Humphrey & Fillmore, Wichita Falls, for appellees.

CHAPMAN, Justice.

In order to correct a date we inadvertently used in our original opinion and to clarify our application of the law to the facts in one paragraph thereof, the original opinion of September 22 is withdrawn and the following is announced in lieu thereof.

This appeal is from an order of the court below denying a change of venue.

Raymond King, L. C. Rushin, Theo L. Lynch, and V. Cross, joined by their respective landlords, sued Aerial Sprayers, Inc., of Stamford, Texas, and Pitchfork Land and Cattle Company of Dickens County, Texas. Pitchfork Land and Cattle Co. made no effort to change venue and is not before us on appeal. Aerial Sprayers, Inc., sought a change of venue to Jones County, Texas, the undisputed county of its residence.

The cause of action alleged by the respective plaintiffs in each of the four suits being essentially the same the four cases were, by agreement of all parties, consolidated on the venue hearing.

As exceptions to the venue rule giving the right to be sued in the county of residence appellees are relying on Subdivision 9a (negligence of appellant in the county where the suit was filed that proximately resulted in the injuries) and 23 (suit against a private corporation in the county where the cause of action arose) of Article 1995, R.C.S. They also pleaded Subdivision 9 but did not urge it by brief.

Among the grounds of negligence urged by appellee was that of improper mixing of the poison used, the spraying of a hormone herbicide at the time when the wind was blowing at such velocity as to permit the spray mist to drift onto their cotton six to eight miles away and failure to follow the prevailing customs of the industry in Aerial Spraying.

Testimony that is without contradiction shows that on July 14 and 15, 1956, approximately 270 acres in King County,

Texas, on the Pitchfork Ranch was sprayed by airplane for the purpose of killing sun flowers and cockleburs; that shortly thereafter, the first date being August 1, farmers in the Finney Community of King County, six to eight miles northeast of where the spraying was done noticed something peculiar about the leaves, blooms and small bolls on their cotton that seemed to adversely affect its normal development and which it later developed was caused by some sort of chemical; on said dates of the spraying 52½ gallons of 2, 4–D, known as Esteron Ten-Ten, was furnished by Aerial Sprayers plus an undetermined amount of 2, 4–D called Weed-On furnished by Cecil Meador of the Spur Experiment Station, all of which was mixed with Diesel Oil to make four gallons of spray for each acre.

Though there is some testimony by an employee of the Pitchfork Ranch, Jim Humphreys, that the condition of the affected cotton indicated a poison from 245–T more than 245–D, there is ample testimony of probative value from Theo Lynch, A. A. Cox, J. L. Hill, and C. E. Bureson, if believed by the trial court, for it to find the damage was caused from 2, 4–D.

Introduced into evidence as part of the record in this case, without objections, was a label from Esteron Ten-Ten giving full directions and warning in the use of the chemical. The evidence indicates the amount or strength of the killing ingredients necessary to produce an effective kill depends in part on the state of growth of the vegetation, the type of plant to be destroyed, and the weather conditions at the time of application. It also shows that dosages as low as ¼ pint per acre will kill young, tender growth. Elbert Elliott testified if he was spraying for heavily infested weeds he would use a pint to the acre of 2, 4–D. Additionally, the warning on the label introduced in evidence says, "Do not apply Esteron Ten-Ten directly to or otherwise permit it to come into contact with * * * cotton or other desirable plants which are sensitive to 2, 4–D and its formulations, and do not permit spray mists containing it to drift onto them, since even minute quantities of the spray may cause injury during both growing and *dormat* periods." The following warning on the label has dark heavy print: "Accordingly, applications by airplane, ground rigs and hand dispensers should be carried out only when there is no hazard from drift. Do not apply by airplane in the vicinity of cotton, grapes or other desirable 2, 4–D susceptible vegetation."

The record is uncontradicted that Aerial Sprayers, Inc. was poisoning sun flowers and cockleburs, tough wooded plants, at a time of year when they would naturally be in an advanced state of growth, thus requiring heavier application of chemical than when young and tender. It is also in the record that the poisoning was done under the directions of the state Experiment Station at Spur, Texas, experts in the business of plant destruction by chemical application, and that it used 420 pints of Esteron Ten-Ten plus the amount of Weed-On brought by Cecil Meador. The nearest anyone came to testifying how much poison the Experiment Station brought of 2, 4–D was that "it was in 5 gallons cans." The record also shows that Aerial Sprayers and their agents and employees knew there were cotton fields from six to eight miles from the location of their spraying activities and that they were fully conscious of the fact that 2, 4–D was harmful to growing cotton. From the record in this case the trial court had a right to take into consideration all these matters just mentioned in passing upon the killing strength of the ingredients used in determining whether the drift from the spray caused the damages to the cotton crops in question.

The velocity of the wind on July 14 and 15, 1956, and the distance the spray drifted on the occasion in question were highly controversial questions. Raymond King

testified that on the morning of July 15 about sunup the wind was blowing about 10 miles per hour, that he went to gather some roasting ears and when he got back the dust was blowing so badly he had to move into the house to shuck his corn. He testified that when he moved inside the house the wind was blowing 16, 17 or 18 miles an hour from the southwest, the direction that the Pitchfork Land upon which the spraying had been done was located. Over objections of appellant a chart from the U. S. Weather Bureau at Childress, Texas, was introduced in evidence showing that at 5:28 A.M., July 15, 1956, the wind was blowing from the southwest to the northeast at 15 knots per hour. This record is to a considerable extent corroborative of the King testimony. Elbert Elliott, who did the spraying for appellant testified they started the spraying on the morning of July 15 "sometime after six," and that he put on three or four loads of 160 gallons each to finish the 270 acres they started on July 14 and had to quit on account of the velocity of the wind.

There is sufficient testimony of probative value for the trial court to find that the spraying of the Herbicide on the Pitchfork Ranch on July 14 and 15, 1956, was the only spraying done within that vicinity within the period of time to have caused the injury to the cotton in question.

In addition to all the testimony above related the witness Theo Lynch testified, in effect, that he walked and flew over the area from where the spraying was done to the damaged cotton fields, that he had theretofore seen the results of the application of herbicide to vegetation by spraying, that there was a swathe running from 1½ to 2 miles wide from where the spraying was done to the cotton fields that showed a deformed or unnatural condition in the vegetation; that the mesquites within that swathe showed a pale green and more so on the southwest side of the trees than on the northeast side.

"Q. Now tell the court what you observed as you walked across the land. A. Well, sir, we noticed the tops of these weeds and stuff across the pasture were torn and noticed that the mesquites were a pale green on the southwest side more so than on the northeast side."

The testimony also showed by appellees' witnesses that the color of the mesquites within the "swathe" referred to was a more pale color than the same type trees elsewhere in that area and color pictures introduced in evidence and brought forward to us corroborates such testimony. To say the least this testimony furnished other strong circumstances which the trial court had a right to take into consideration in passing upon whether the spray of the herbicides applied by air drifted upon the cotton of appellees.

■ Appellant raises the questions both of no evidence and insufficient evidence to support the trial court's implied findings. In passing upon the insufficiency of the evidence in a case of this nature it is the duty of this court to weigh and consider that which supports the trial court's implied findings and that which does not, and to set aside the judgment and remand the case if after such consideration we conclude the judgment is so contrary to the overwhelming weight of the evidence as to be manifestly unjust, regardless of whether there is some evidence to support it. In re King's Estate (King v. King), 150 Tex. 662, 244 S.W.2d 660; Purvis v. Morehead, Tex.Civ.App., 304 S.W.2d 221; Chantly v. Chrystal, Tex.Civ.App., 274 S.W.2d 765.

■ In applying the rules of law just stated we would have to say that under all the circumstances of this case the evidence was sufficient for the trial court's implied findings to the effect that the herbicides loosed by the Aerial Spraying on the Pitchfork Ranch in July, 1956, drifted

onto the cotton crops of appellees; that Aerial Sprayers Incorporated was negligent in spraying herbicides of the strength used at a time when the wind was blowing at such velocity as to permit such spray to drift upon appellees' cotton, and that such negligence was the proximate cause of the damages complained about. In view of what we have just said it seems unnecessary for us to write upon the question of no evidence raised by appellant.

█ Though it is unnecessary to a decision of this case we are also of the opinion that the evidence of appellees was sufficient to retain venue in King County under Subdivision 23 of Article 1995. Such was specifically held in Aerial Sprayers, Inc., v. Yerger, Hill & Son, Tex.Civ.App., 306 S.W.2d 433, a case we do not consider showed as strong a cause of action for the plaintiff as the instant case.

█ Appellant urges error because the trial court permitted the introduction of the U. S. Weather Bureau records of Childress, Texas, approximately 60 miles away, but the nearest official weather station to the spraying. By brief appellant admits there is no Texas case determining this particular question. The courts of other jurisdictions are not in harmony on the admissibility of weather records prepared at a place different from the place in controversy. If the evidence offered had to do with rainfall or other falling weather we believe it would be inadmissible in the absence of proof that the same or closely similar weather conditions existed at the two places at approximately the same time. Even on the question of wind velocity we believe certain conditions would make the testimony inadmissible. Under the facts of this case, the two places being located as they are in West Texas, the time being early in the morning in the middle of July with the weather completely clear we believe the introduction of the records complained about went to the weight of the testimony and did not constitute error under the circumstances. Even if we should be wrong in so holding the error would be harmless because the testimony of Raymond King standing alone, if believed by the trial court, was sufficient from which it could find the wind was blowing at a velocity sufficient to cause the spray to drift to appellee's cotton. The law seems to be well settled that in considering the complete record of a case the admission of incompetent evidence would not constitute reversible error when there is other competent evidence on the same question in the record. Dillingham v. Currie, Tex.Civ.App., 92 S.W.2d 1122, 1127; Panhandle Eastern Pipe Line Co. v. Jackson, Tex.Civ.App., 306 S.W.2d 145, 149. Additionally, Rule 434, Texas Rules of Civil Procedure, provides that "no judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that the trial court has committed an error of law in the course of the trial, unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case * * *". This court not being of such opinion the complaint is not well taken, all points of error assigned are overruled, and the judgment of the trial court is affirmed.