**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**Arvil A. JOHNSON, Appellee.**

No. 6852.

Court of Civil Appeals of Texas.

Amarillo.

March 23, 1959.

Rehearing Denied April 27, 1959.

Underwood, Wilson, Sutton, Heare & Boyce, Amarillo, for appellant.

Gordon, Gordon & Buzzard, Pampa, for appellee.

CHAPMAN, Justice.

This is a workmen's compensation case filed by appellee, Arvil A. Johnson. The employer was Cree Drilling Company and the insurance carrier, appellant herein, is Texas Employers' Insurance Association. The case was tried to a jury and upon findings that appellee suffered 20 per cent partial incapacity for a period of 34 weeks after May 26, 1957, and that such disability increased to total and permanent incapacity on January 20, 1958, the court entered judgment for appellee in accordance therewith.

Appellant's first two points are argued together and will be considered by us accordingly. They are to the effect that there was no evidence to support the jury findings that at the end of 34 weeks the incapacity, which had theretofore been 20 per cent partial, became total and permanent on January 20, 1958; that the evidence of probative value was insufficient to support such findings; and that such findings were so against the weight and preponderance of the admissible evidence that the discretion of this court should be exercised to vacate same.

If an examination of the record reveals sufficient evidence to support the jury findings challenged by appellant, it becomes unnecessary for us to write on the question of no evidence, because the former refutes the latter. Appellant having also raised the question of the evidence being sufficient to support the verdict and asserting that the verdict was against the weight and preponderance of the evidence it becomes necessary for us to consider and

weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if we thus conclude that the verdict is so against the great weight and preponderance of the evidence · as to be manifestly unjust—this, regardless of whether the record contains some "evidence of probative force" in support of the verdict. In re King's Estate (King v. King); 150 Tex. 662, 244 S.W.2d 660.

The testimony shows that as the drilling crew ·was "rigging up," with Jim Philpot and appellee stringing a light wire across a steel circulating mud pit 8 feet across and 5 or 6 feet deep, appellee slipped on a muddy board lying across the pit, fell back against the side thereof, his back, 4 or 5 inches below his belt line, striking the edge of the steel pit, and his body then falling on down into the bottom thereof. He testified in effect that the fall caused him so much pain he had to be helped out by Jim Philpot, but that he continued to work under severe pain for 5 or 6 days before going to see a doctor.

Dr. Charles Ashby, a General Practitioner, and a senior member at the Medical and Surgical Clinic of Pampa testified for · appellant insurance company, and his testimony leaves no doubt as to appellee having suffered a back injury. Their records show his first visit to their clinic was on June 20, 1957, at which time the clinic took X-ray pictures. A number of other pictures were taken later. The first time Doctor Ashby saw the patient was on July 8, ·1957, and at that time he still had a swelling over his low back and the X-rays showed a fracture of the fifth sacral vertebra, though he continued to work as a roughneck from the date of the injury, May 26, 1957, to January 20, 1958.

Doctor Richard Falkenstein, a General Practitioner of the · Falkenstein and Elder Clinic in Pampa and Doctor Elias Margo, Chief of Staff of the Bone and Joint Hospital and McBride Clinic of Oklahoma City, an Orthopedic Surgeon, a member of the American College of Surgeons, the International College of Surgeons, and the American Academy of Orthopedics testified for appellee, the latter by deposition. The difference in the medical testimony of the doctors used by the respective parties was principally as to the extent and duration of the injury, the effect such injury had on appellee as a workman and their differences in the interpretations of the X-ray pictures. Though admitting there is a slight narrowing between the lumbosacral joint, that joint between the fifth lumbo vertebra, Doctor Ashby testified in effect that it was not an injury such as to cause pain, while Doctors Margo and Falkenstein disagreed. Doctor Falkenstein, who examined appellee on October 18, 1957, March 12, 1958, April 1, 1958, and May 16, 1958, testified:

"Q. Basing your opinion on the objective symptoms revealed by these examinations, please state what in your opinion is wrong with Arvil A. Johnson? A. Mr. Johnson has a ruptured intervertebra disc with nerve root pressure.

"Q. At what level? A. Possibly at L–5—between L–5—and S–1, but he possibly might also have a disc between L–4 and L–5. I rather think it is between L–5 and S–1.

"Q. Is ·L–5 and S–1 commonly referred to as · the lumbosacral joint? A. That's right. * * *

"Q. What happens when a disc, an intervertebra disc ruptures, please? * * * A. The disc usually presses on the nerves in that area as they do in this particular case on Mr. Johnson."

Doctor Falkenstein also testified appellee got worse during the time he saw him and that in a case of his type injury there is usually a deterioration or worsening of the patient's condition. Then in answer to a hypothetical question, based on substantially correct assumptions, he testified that in his· opinion, based on objective symptoms, appellant's trouble was nerve root pressure

from a protruding intervertebra disc and he was totally disabled from performing ordinary manual labor. It would extend this opinion to unnecessary length to quote here extensively from Doctor Margo's testimony, also, but it was essentially the same as that given by Doctor Falkenstein concerning the deterioration or worsening, with time, of appellant's condition from the date of injury, and with respect to his being totally and permanently disabled.

The testimony of appellant shows in effect that he continued to work on the same rig as a roughneck for several days following his injury; that he was bumped from his job on the large rig and then went to work on a smaller rig where the work was lighter; that he continued to have pain during all the time, but that he had a wife and five children and had to make a living for them; that during the time he was working on the rigs following his injury he tried to find lighter work and could not do so; that the second rig he worked on following his injury closed down January 20, 1958, but that he had, on the same day, a chance to go back to roughnecking and he turned it down because, "My back bothered me so bad I couldn't make a hand. It just kept getting worse all the time."

Appellant, by brief, admitted that under the evidence the jury had the discretion to conclude that appellee became totally and permanently disabled on May 26, 1957, the date of the injury, and continued to work thereafter only out of necessity, but it insists they could not find he was partially disabled from the date of injury to January 20, 1958, and then became totally disabled.

The testimony of appellee indicated his pain and discomfort growing out of the injury was episodic in nature but that he was able to continue in the work, though not making as good a workman as before the injury, until January 20, 1958, and that from that date he could no longer work as a roughneck. We believe when the rules of law above announced in the King case

are applied to the facts of our case the evidence was sufficient to support the findings of the jury. We also believe such findings were not so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. Particularly is this true when we consider the fact that appellant admits the evidence was sufficient for the jury to have found total and permanent disability from the date of injury.

Under appellant's Points 1 and 2 under discussion it takes the further position that because appellee went back to work as a shoe repairman after January 20, 1958, there was nothing in the admissible evidence to support a finding that his condition changed from 20 per cent partial incapacity to 100 per cent incapacity.

The evidence shows in effect that appellee tried to find light work and could not do so until his brother-in-law went back into the shoe repair business and let him work for him and that the type work he was doing for his brother-in-law was such as could be done by even a one-legged man. Even then he was restricted in his physical activities, could not lift his children, had difficulty getting up and down, and required sedatives almost constantly for pain relief. The evidence also shows that his remuneration per week decreased substantially from his income as a roughneck.

The fact that he continued to work after the injury does not preclude a finding by the jury of total and permanent incapacity under the circumstances of this case. Trinity Universal Ins. Co. v. Rose, Tex. Civ.App., 217 S.W.2d 425; Southern Underwriters v. Grimes, Tex.Civ.App., 146 S.W.2d 1058; Hartford Accident & Indemnity Ins. Co. v. Miller, Tex.Civ.App., 5 S.W. 2d 181; Texas Employers' Ins. Ass'n v. Mallard, Tex.Civ.App., 192 S.W.2d 302; Traders & General Ins. Co. v. Heath, Tex. Civ.App., 197 S.W.2d 130; Gulf Casualty Company v. Jones, Tex.Civ.App., 290 S.W. 2d 334. Accordingly, appellant's Points 1 and 2 are overruled.

Appellant's Points 3 and 7 are based upon alleged error in argument. In his charge to the jury the court defined "partial disability," as follows:

" 'Partial Disability', is meant disability less than total where an employee, by reason of injuries sustained in the course of his employment is only able to perform part of the usual tasks of a workman, but, nevertheless, he is able to procure and retain employment reasonably suitable to his physical condition, and ability to work, or he is only able to perform labor of a less remunerative class than he performed prior to his injury whereby he suffers a depreciation or deduction in his earning capacity."

Counsel for appellee in his argument said:

"Then, as you glance over the term 'partial disability', notice this—I shall not read it over, I won't take the time to read it—but the word 'workman', 'labor', 'work', 'labor', appears several times throughout that charge. Never forget that this is a case—that this is the workmen's compensation law, and you are dealing here with a workman. Now, the fact that he has a trade, something he can go to without starving to death, should have no bearing on this case, in the light of these definitions. * * *"

To which argument appellant objected as follows:

"Mr. Pipkin: Your Honor, I want to object to that because that is unwarranted in fact and in law. I think the trade that he is following is also covered under the compensation act."

The court overruled said objection and counsel for appellee then argued as follows:

"It may be that 99 out of a 100 of these cases that we see, we see a man gradually go down until he is on relief with nothing to turn to, but the fact that Johnson is able and is that lucky is something that should not be made available to the insurance company as a defense. This just happens to be one of those kind of cases, and I am glad for him."

The record does not show any objection to the latter argument.

Appellant, by brief, asserts that the argument complained about was a statement, "in substance, that the 'trade' of shoe cobbler was excluded from the contemplation of the Workmen's Compensation law because not 'work' or 'labor,' " and "that the jury was limited to considering only appellee's ability to work as a roughneck, and had no right to take into account his subsequent work in a different occupation." It cites Western Indemnity Co. v. Corder, Tex.Civ.App., 249 S.W. 316, as its authority. That case holds that it was reversible error for appellee's counsel to argue that "total incapacity" as used in the court's charge meant incapacity from following the work plaintiff was doing when injured. that argument is a far cry from the argument we have under consideration here. Actually, the gist of what counsel for appellee said that was objected to was that the fact his client had another trade he could go to *without starving to death* should have no bearing on the case. (Emphasis added.)

In the first place the Corder case was decided before the New Rules, when improper argument was presumed prejudicial. Our Supreme Court has said that, "Cases decided prior to the adoption of the Rules have little value as precedents because they were decided under a rule which required a reversal if the court entertained any doubt of the harmful effect of the argument." Aultman v. Dallas Railway & Terminal Co., 152 Tex. 509, 260 S.W.2d 596, 600. The testimony of Doctors Margo and Falkenstein, above related, and the testimony of appellee himself, and not the argument complained about, could have been, and likely was, the basis upon which the

jury found that appellee suffered total incapacity on January 20. It is true the doctors just named testified appellee suffered total and permanent disability on May 26, 1957, but because he continued to work, though at reduced efficiency and under considerable pain, they gave the appellant the benefit of the doubt for that period. We think it much more likely that the jury considered the doctors testimony of total and permanent and the appellee's statement that he declined the rougnecking job offered him on January 20, 1958, because he could no longer do the work, in finding he was totally and permanently disabled than that they were influenced in the finding by counsel's argument.

■ The alleged error of argument based on appellant's seventh point is that counsel for appellee, in his summation before the jury, said:

"And then, Dr. Falkenstein—he has no other motive, no purpose than to share with you the truth. His presence in the court room is nothing more than a respect for the truth by coming here when he knows the entire Cree industries will be against him and Texas Employers, the biggest insurance writer in the State against him. * * *."

Appellant's counsel objected to the argument, the court overruled the objection, and appellee's counsel continued as follows:

"Nothing in the world to gain and everything to lose. Why did he come here? Just a love for the truth. A man of eminent experience * * *."

We believe the argument that the Cree Industries and the insurance company will be against Dr. Falkenstein and that Texas Employers is the biggest insurance writer in the state was unwarranted from the record but we believe appellant has wholly failed to show any harm that could have resulted to it from said argument. In the absence of a showing that the jury would be prejudiced against the insurance company just because it was the biggest insurance writer in the state, if it was, or because "the entire Cree Industries will be against him and Texas Employers, the biggest insurance writer in the State against him * * *" we cannot see how any possible harm could have resulted to appellant from such argument. There is not even an inference in the record which would indicate that any juror was so close to or such a friend of Dr. Falkenstein that he or she would be prejudiced by such argument.

■ The argument with respect to Dr. Falkenstein's presence there as a witness being due to his respect for the truth was a reasonable and proper deduction from the obvious attempt on the part of appellant to portray the doctor to the jury as a witness interested in helping appellee's counsel, Ross Buzzard, by having testified for him in many cases.

■ Though part of the argument complained about may have been outside the record the burden was upon appellant to show from the record as a whole that such alleged error or errors committed by the trial court amounted to such denial of the rights of appellant as were reasonably calculated to cause and probably did cause the rendition of an improper verdict. Rules of Civil Procedure, Rule 434; City of Galveston v. Hill, 151 Tex. 139, 246 S.W.2d 860, 863; Mrs. Baird's Bread Co. v. Hearn, Tex., 300 S.W.2d 646, 650; Cloud v. Zellers, Tex., 309 S.W.2d 806, 808; Condra Funeral Home v. Rollin, Tex., 314 S.W.2d 277, 280; State v. Parrish, Tex., 320 S.W.2d 330, 332. Believing the burden required of appellant has not been discharged and that the answers made by the jurors would not have been any different, absent such argument, Points 3 and 7 are overruled.

Appellant's Point 4 asserts error on the part of the trial court in receiving deposition testimony of Doctor Margo to the effect that appellee had a nerve root irritation as against objection that he had seen appellee for the purpose of preparing him as a witness, such testimony being allegedly based on and influenced by subjective

symptoms. Its Point 5 is based on alleged error in the manner in which such deposition testimony· was placed before the jury.

Counsel asked Doctor Margo in direct interrogatories to list those findings he regarded as subjective and those regarded as objective, and in a discussion of attorneys with the court, out of the presence of the jury,. assured the court, "And I will not offer those that are subjective, nor will I offer any opinion based upon subjective complaints."

Though appellee's testimony was to the effect that Doctor Margo made the examination of him for the purpose of preparing himself as a witness, Doctor Margo himself stated the following in his deposition:

"Q:· Did you know or suspect that he came to you in connection with what either was or probably would be a law suit?

"A. No. All I knew was he was sent to me for an examination and report of my findings."

Direct Interrogatory 39 and the answer thereto was as follows:

"Interrogatory 39: Which of your findings were demonstrated objectively?"

To the Interrogatory 39 the witness answered:

"Restricted motion of the back and in straight leg raising, and X-ray findings as in the preceding answer."

Then in the 41st Direct Interrogatory Doctor Margo was asked, "Were the subjective complaints corroborated by objective findings?," and he answered in the affirmative. Objection was made that such question and answer brought in the subjective. The court overruled the objection.

In Cross Interrogatories the record shows:

"9. Did your examination include the taking of any character of statement or history from Mr. Johnson?

"A. `Yes.

"10. Did that statement or history play some part in whatever conclusions you reached about him?

"A. Yes."

Direct Interrogatory 44 was a hypothetical question based upon what we believe to be a substantially correct statement of proven facts. After relating some of the history of appellee's work, the manner in which he was injured and the effect of the injury upon him, the question asked, "Do you have an opinion based upon an assumption of the truth of ·the foregoing facts and on the *objective symptoms* revealed by your examination as to whether or not the fall of May 26, 1957, was, in reasonable probability, the cause of the difficulty in Mr. Johnson's low back?" To that question he · answered in the affirmative. Then Interrogatory 45 asked him to state what his opinion was. The Doctor answered, "Basing it on the history as given, it results from the alleged accident, as related." Clearly the statement, "Basing it on the history as given" has reference to the assumptions made in the hypothetical question. (Emphasis added.)

Appellant also complains that in reading the deposition the attorneys read some questions that would have required a consideration of subjective symptoms and that a number of questions and answers admitted by the court were general in nature rather than applying specifically to appellee. Direct Interrogatory 39 asked Doctor Margo the specific question as to which of his findings were demonstrated objectively and he related them. Likewise, the hypothetical question, Direct Interrogatory 44, asked him to base his answer "upon an assumption of the truth of the foregoing facts and on the objective symptoms revealed by his examination * * *" It is inconceivable to us that a man as highly educated as this record shows Doctor Margo to be would base his answers to Direct Interrogatory 39 and 44 on subjective symptoms, as positively as they asked him to give considera-

tion only to the objective symptoms in answering. We believe the answer lies in the fact that Cross Interrogatory 10 was a general question wherein he answered that the statement or history played some part in whatever conclusions he reached about appellee. He did not say they played a part in answering the Interrogatories 39 and 44. We do not believe in this case the record shows he considered the subjective symptoms in making reply to those two specific questions, nor do we believe it was error for one of the attorneys to read some questions, the answers to which would have required a consideration of subjective symptoms, when the answers were not read.

The most novel and interesting question raised on the points under discussion is the effect of the question and answer to Direct Interrogatory 41, which asked if the subjective complaints were corroborated by objective findings. No authority has been cited, nor have we found any, which passes on the admissibility of such testimony where an objection is made, as in this case, that the answer gives consideration to the subjective symptoms.

We believe it to be clearly within the province of the human mind to establish an opinion from objective symptoms alone, even though the mind has been exposed to subjective symptoms. Additionally, we believe the mere fact that Doctor Margo testified the subjective symptoms were corroborated by objective findings does not establish the fact that he considered subjective symptoms in making reply to the questions objected to on that ground.

The cases we find nearest in point on the question here under discussion are Traders & General Insurance Co. v. Milliken, Tex.Civ.App., 110 S.W.2d 108 and United Employers Casualty Co. v. Marr, Tex.Civ.App., 144 S.W.2d 973. When common sense and reason are added to the authority of the cases just cited we have no hesitancy in saying that none of the questions raised in Points 4 and 5 constituted error. In any event, they did not

constitute reversible error. As heretofore stated, the testimony of Doctors Margo and Falkenstein is corroborative of each other and substantially all the material testimony complained about in these points under discussion is in the record in Doctor Falkenstein's testimony without a proper assignment that it was based on subjective symptoms. It is true the question is raised in appellant's brief, but it was not raised on its Motion for New Trial. "A ground of error not distinctly set forth in the motion for new trial, in cases where a motion for new trial is required shall be considered as waived." Steinke v. Schmid, Tex.Civ.App., 223 S.W.2d 955, 956; Rule 324, T.R.C.P. Therefore, so far as Doctor Falkenstein's testimony is concerned in this record it is before us based upon objective findings where that question is material. Even if we should concede that none of Doctor Margo's testimony was admissible and strike it from the record completely, there still was Doctor Falkenstein's testimony from which the jury could have answered the issues just as they did. We are unable to see where there has been any reversible error committed in the method in which Doctor Margo's deposition was presented to the jury. The mere fact that attorneys read some questions where the answers thereto might have been based on subjective symptoms and the attorney then reading the answer to such questions would state in effect that such answer has to do with the subjective and I will not read the answer does not, to us, indicate error. In considering the complete record in a case, the admission of incompetent evidence would not constitute reversible error when there is other competent evidence on the same question in the record. Aerial Sprayers, Inc. v. King, Tex.Civ.App., 317 S.W.2d 602; Dillingham v. Currie, Tex. Civ.App., 92 S.W.2d 1122, 1127; Panhandle Eastern Pipe Line Company v. Jackson, Tex.Civ.App., 306 S.W.2d 145. Additionally, appellant in the points here under discussion, is under the same burden of Rule 434 and the cases heretofore cited which require it to show the errors complained

about amounted to such a denial of its rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. These same rules of law are applicable to appellant's "Additional Statement Under Point 5," and Points 4 and 5 are overruled.

Under its 6th point appellant asserts error on the part of appellee's counsel in stating in the presence of the jury a statement in Doctor Margo's medical records that corrected an answer he had made to a question asked by appellant in its cross interrogatory. Appellant had introduced Cross Interrogatory 7 and the answer thereto, which was to the effect that at the time he saw appellee in September, 1957, the history he obtained did not show he was working regularly. Counsel for appellee offered to introduce into evidence part of the record made of appellee's visit to the clinic. In Cross Interrogatory 15, 16 and 17 appellant had asked Doctor Margo what records existed in his office at the clinic with respect to appellee, told him to attach them or copies thereto as exhibits to his testimony, asked him if he had written any other report dealing with him or his condition, or corresponded with anyone on the subject, and, if so, to attach the originals or copies as exhibits to his testimony.

When these reports were offered, the following transpired:

"Mr. Buzzard: I would like to offer 16 and 17 and 18, or rather, 16 and 17 which includes 15. * * *

"Mr. Pipkin: Those are the records with which I will stipulate with you there.

"Mr. Buzzard: That they may be admitted?

"Mr. Pipkin: Yes, sir—wait a minute. I will do it this way. Subject to the objections I have already made during the recess here. In other words, I won't question the accuracy—

I mean, that they are reports made there, but I still want to object, to keep my objection, made during the recess, directed to them.

"Mr. Buzzard: Of course, that would go to part of that—let me just offer one line out of this, which reads: "He has always had * * *" —on the second page of Dr. Margo's report * * *.

"Mr. Pipkin: Where is that?

"Mr. Buzzard: Right here (indicating). I offer this for a limited purpose only; not for the proving of the facts narrated, but for the purpose of showing that the doctor was mistaken when he said that Mr. Johnson didn't tell him about the working, just for a limited purpose.

"Mr. Pipkin: I want to object because you are impeaching your own witness here.

"Mr. Buzzard: No, I am just saying he is mistaken because the record shows he had a nagging discomfort but continued working.

"Mr. Pipkin: I will still object because that is subjective in the first place, and the doctor has already stated he based his opinion on that fact.

"Mr. Buzzard: If the Court please, I am not offering that statement as a proof of the truth of the facts asserted, but only for the purpose of showing that the doctor apparently made an error in his deposition.

"The Court: Is that a photostatic copy of his report made on the examination?

"Mr. Buzzard: Yes, sir.

"The Court: I don't know. I am kind of afraid of it, Ross. I will sustain the objection."

The only statement that could possibly be harmful from such proceeding was Mr.

Buzzard's statement to the effect that the record shows he had a nagging discomfort but continued working. It is true it had the effect of placing before the jury that part of the report of Doctor Margo, but the record clearly shows such report, at least that part of it in the objectionable sentence, was based on what appellee had told the doctor. Appellee in effect testified to essentially the same facts and therefore such evidence was before the jury from other sources. Under the circumstances of this case and the authorities heretofore cited the statements of appellee's attorney were not of such harmful nature as to constitute reversible error and Point 6 is overruled.

Appellant's 8th and last point is based on an alleged visit by appellee with some members of the jury during the noon recess. The testimony on the point heard on appellant's Motion for New Trial simply shows that appellee and several other men, not jurors, at the noon recess were sitting on the court house steps on the warm spring day of the trial and several of the jurors came along and sat down on the same steps. This was before any evidence was offered in the case and the limited verbal exchange between appellee and two of the jurors he knew was held in the presence of the other jurors and other men and had to do only with some conversation about horses and cows. The case was not mentioned and appellee got up in the same manner as he had been getting up out of his chair in the court room without any affectation of disability of locomotion. The trial court overruled the Motion for New Trial on this assignment and he clearly did not abuse his discretion in doing so. In fact, the point is completely without merit and requires no citation of authority to overrule it.

This case has been studied thoroughly. It is very much like many others we have before us from time to time where each side uses doctors who testify opposite to each other on the material matters concerning claimed injuries and their effect upon the claimant. The jury, after listening to doctors on both sides in this case, and appellee's testimony, chose to believe appellee and his doctors. We do not believe we have the right to substitute our findings for those of the jury, and believing no reversible error was committed the judgment of the trial court is affirmed.