PITCHFORK LAND AND CATTLE COMPANY et al., Appellants,

v.

Raymond KING et al., Appellees.

No. 6954.

Court of Civil Appeals of Texas.

Amarillo.

April 25, 1960.

Rehearing Denied May 23, 1960.

Kilgore & Kilgore, Dallas, Jack W. Watson, Stamford, for appellants.

Bullington, Humphrey, Humphrey & Fillmore, Wichita Falls, for appellees.

CHAPMAN, Justice.

This is an appeal from a judgment rendered by the trial court upon a jury verdict in favor of 17 farmers, joined by the Landlords of those who were tenants, plaintiffs below, against the two defendants below, Pitchfork Land & Cattle Company and Aerial Sprayers, Inc., jointly and severally, appellants herein. Except where their names are used the farmers will be hereinafter referred to as appellees or the farmers. Appellants, Aerial Sprayers, Inc., will be hereinafter referred to as Aerial Sprayers and Pitchfork Land & Cattle Company, as Pitchfork.

Recoveries were sought by appellees for damages to their respective cotton crops on some 22 farms growing out of spraying operations conducted by Aerial Sprayers on land belonging to Pitchfork located 7½ to 15 miles southwest of the farms in question and on which a hormone herbicide commonly known as 2, 4–D, with the trade name, Esteron Ten-Ten, was sprayed for the eradication of sun flowers, cockleburs and other obnoxious weeds infesting the area sprayed. The first question with which we are faced, so far as the rights of Pitchfork is concerned, is whether Aerial Sprayers was an independent contractor as a matter of law, the question having been submitted to a jury with proper instructions and answered adversely to Pitchfork.

Our courts in Texas from a very early day have held the burden is upon the one claiming exemption to establish the independence of the contract of the workman. Justice Brown, speaking for our Supreme Court in Taylor, B. & H. Ry. Co. v. Warner et al., 88 Tex. 642, 32 S.W. 868, 870 said:

"Every person who is found performing the work of another is presumed to be in the employment of the person whose work is being done, and if the facts be such as to exempt * * the person for whom the work is being performed, from liability for the acts of those performing such work, it devolves upon him who claims such exemption to make proof of the terms of the contract, showing that the relation of master and servant did not exist."

The still earlier case by the Supreme Court of Burton v. Galveston, H. & S. A. Ry. Co., 61 Tex. 526 was cited by Justice Brown for authority on the statement just quoted. See also Beaumont, S. L. & W. R. Co. v. Olmstead, 56 Tex.Civ.App. 96, 120 S.W. 596 (writ refused); Liberty Mut. Ins. Co. v. Boggs et al., Tex.Civ.App., 66 S.W.2d 787 (writ dismissed).

Certain tests to apply to the facts of each case to determine the independent contractor question have been spelled out by our Supreme Court. In Industrial Indemnity Exchange v. Southard et al., 138 Tex.

531, 160 S.W.2d 905, 907, that Court, though recognizing there are other tests, set out the following general recognized tests:

"(1) The independent nature of his business; (2) his obligation to furnish necessary tools, supplies, and material to perform the job; (3) his right to control the progress of the work, except as to final results; (4) the time for which he is employed; and (5) the method of payment, whether by time or by the job."

In Burton v. Galveston, H. & S. A. Ry. Co., supra, the Supreme Court set still other tests by saying:

" * * * we are of the opinion that, in reason and upon the weight of authority of adjudicated cases, they are and should be considered the servants of the railway company; for in such case it has retained to itself two of the most essential powers of a master—the power to select and the power to discharge * * *"

The San Antonio Court of Civil Appeals in writing on the question here under discussion has held: "It is the right or authority to control, and not the exercise thereof, which determines the status or relationship of the parties." Texas & N. O. R. Co. v. Rittimann, 87 S.W.2d 745, 749 (writ dismissed).

The Supreme Court has indicated some adherence to the right-to-control doctrine by saying through Justice Garwood: " * * the right of control in the alleged master over the detailed means whereby the alleged servant is to accomplish an ultimate result may be as important as the actual exercise of that right * * *". Great Western Drilling Company v. Simmons, 302 S.W.2d 400, 403.

Though we realize the court made some limitation when it said the right to control *may* be as important as the actual exercise of that right we believe the hold-

ing is applicable to the facts of our case. (Emphasis added.) So far as the interest of Pitchfork in the spraying was concerned it left its assistant manager, Jim Humphreys in charge of the operations on the occasion in question. Upon questioning by appellees' counsel concerning whether he would have stopped the spraying had he thought the wind was too high he reluctantly answered:

"Q. Would you have shut it down, Mr. Humphreys? * * * I mean when I say shut it down, would you have stopped this spraying on that occasion if you would have thought that you were endangering anybody's crops. A. Yes."

We believe this testimony shows without question that Pitchfork had the authority to control at least the detail of time and progress in spraying, two of the very elements mentioned in the Southard case by the Supreme Court. Additionally, we believe the testimony shows Pitchfork had control of the strength of the poison used. The record shows Pitchfork through the years had followed very closely the recommendations of Cecil Meador and C. E. Fisher of formulations for spraying on their ranch. Both of these men had been employees of the State Experiment Station at Spur and had considerable experience in spraying. Mr. Fisher testified:

"Q. Now, did you have anything to do with the selection of the preparation of the formula that was used in that spray. A. Yes, we made a general recommendation.

"Q. To whom was that recommendation made? A. To Mr. Burns." (Mr. Burns was Pitchfork manager.)

The record also shows that Pitchfork secured 15 gallons of the poison from the Spur Experiment Station that went into the spraying operation in question, that Aerial Sprayers was not paid by the job but by the acre, and that Pitchfork furnished the flagman for the airplane pilot. When all these

facts are considered together and applied to the rules above announced by our courts we feel compelled to say the record did not show as a matter of law that Aerial Sprayers was an independent contractor and that the trial court did not commit error in submitting the question to the jury.

Appellants have brought forward in two separate briefs a combined total of 48 points. Many of them are duplications so we shall not attempt to discuss the points of each appellant separately. Other than questions of evidence relating to wind velocity and directions and the qualifications of appellees to give their opinions concerning their probable respective yields, the other points concern causation and the sufficiency of the evidence to sustain the grounds of negligence submitted.

The spraying was done on July 14 and 15, 1956. The appellees observed something wrong with their cotton approximately August 1. Appellants' expert witnesses testified the herbicide effects should have been apparent in the period from 7 to 10 days. This left only approximately five days difference in the time the farmers observed the effects and the time they should have been apparent. There is no evidence of probative value whatever that any other spraying was done in the area under consideration within the period of time that could have caused the herbicide effects. Theo Lynch one of the appellee farmers testified in effect that he flew over the area from the Northcutt Store in the Finney Community to the Pitchfork Headquarters with Buck Sims and that a pale green strip different to the other vegetation was observable in early August; that the path ran in a northeasterly-southwesterly direction and was visible to a place about two miles east of Pitchfork Headquarters, the approximate area the record shows the spraying was done; that he later walked the ranch out from the Finney cotton fields to China Draw where the spraying was done; that the width of the affected area in the pasture was about a mile and a half and that the tops of the weeds and plants

were rolled up all the way through. The record shows Buck Sims had been in the spraying business ten years and had acquired great and varied experience in the business of spraying and observing its effects; that he checked and sprayed cotton through July to September each year of about 35,000 to 40,000 acres; that the mile and a half strip running from the Finney Community cotton fields almost to the Pitchfork Headquarters showed a pale green color on the mesquites; that he traced the condition from Pitchfork right into the cotton fields; that he did not examine the vegetation from the ground but that from what he had seen before he presumed it was caused by herbicide.

Appellants used a number of witnesses who qualified as experts and whose testimony, if believed, would have required a finding that the spraying operation on Pitchfork could not have caused the effect found on appellees' cotton because it was not observed in the normal time, because of the distance involved and because the conditions described by Lynch were not there except as to some light-colored mesquite trees, which they say was caused by dry weather and insects.

Testimony of experts, as in this case, is generally opinion evidence. Our Supreme Court has on many occasions held that the jury in determining facts is not bound by the opinion of witnesses, Simmonds et al. v. St. Louis, B. & M. Ry. Co., 127 Tex. 23, 91 S.W.2d 332; Fry v. Dixie Motor Coach Corp., 142 Tex. 589, 180 S.W.2d 135; and that opinion testimony does not establish any material fact as a matter of law. Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345; Board of Firemen's Relief & Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W.2d 181, 27 A.L.R.2d 965. Additionally, we believe Buck Sims' wide experience shown by the record would qualify him as an expert on effects to plant life that are caused by contact with herbicides.

Mr. Burns, manager of Pitchfork, testified several times in the record that their

investigation showed a flying pattern from China Draw 40 miles to Swearingen through the Finney Community that showed herbicide effect. He later attempted to explain he did not mean the effect was all the way but the record shows the following testimony:

"Q. All right. Then if there was affect for 40 miles these cotton fields that were within 7 and 8 miles away from this spraying had to be pretty close compared to this 40 miles, wouldn't they? A. Yes, sir.

"Q. All right. Now you meant what you said didn't you, when you said from China Draw through there forty miles. A. Yes, that is exactly what I meant.

"Q. All right. A. I'll stand behind it too."

█ It is probable Mr. Burns did not intend to leave the meaning the questions and answers just quoted indicate but they are in the record and we cannot say the jury did not have a right to consider them along with the other evidence.

Even appellants and their expert witnesses admit there was herbicide effect on appellees' cotton. It became apparent to the farmers on approximately August 1. There is not any evidence of probative value in the record to show there was any other spraying in the community at a time that could have caused the effects of herbicide admitted. There is an abundance of other material circumstantial evidence showing causation and negligence. The record shows the State regulations are against airplane spraying of 2, 4–D when the wind is more than ten miles per hour, yet there is evidence in this record from which the jury could have considered the wind was from eighteen to twenty-one miles per hour at the time of the spraying on July 15, the day it was blowing from a southwesterly to a northeasterly direction, the very direction the farms were located

from the spraying operations. The herbicide was mixed with diesel oil, a chemical lighter than water and hence more subject to drift. On the morning of July 15 from seventy to one hundred ten pounds of acid equivalent was sprayed in finishing the operation that was begun the day before. Dude Elliot, the pilot who did the spraying and who was later killed in such operations testified by deposition before his death that if he was spraying heavily infested weeds he would use one pint to the acre, which was only half as strong as that used on the occasion in question. Even the experts who testified admitted that only one ounce of 2, 4–D sprayed uniformly over thirty-five acres would have a serious depressing effect upon the yield of cotton in the tender, fruiting stage.

The grounds submitted upon Pitchfork's negligence were failure to use a wind gauge, failure to properly mix the spray material and failure to discover after the spraying commenced that the direction and velocity of the wind would carry the spray to appellees' lands. The grounds submitted upon Aerial Sprayers' negligence were failure to confine the herbicide outside the boundary of the cotton crops in question, failure to use a wind gauge to check the velocity and direction of the wind, failure to properly mix the materials, failure to discover within a reasonable time after beginning the spraying that the velocity of the wind would cause the spray to drift and settle on appellees' cotton, and if the wind was blowing over ten miles per hour on the occasion of the spraying. Each was answered in the affirmative and each found to be a proximate cause of the damages to appellees' crops.

██ When the record is considered as a whole and the applicable rules applied by which an appellate court is bound in considering findings of fact by a jury we believe there was sufficient evidence of causation shown. Aerial Sprayers, Inc. v. Yerger, Hill & Son et al., Tex.Civ.App., 306

630

S.W.2d 433, 434. It is true in that case the court said, "cotton on the Yerger farms was damaged * * * within the period for damage to normally appear following spraying * * *" but we do not believe the trial court in our case would have been bound by the positive, exact, precise 7-to 10-day period to the extent that it was legally obligated to hold the farmers had to recognize the herbicide effect within that period before they could show causation. As a matter of fact appellants themselves proved some causation. We refer to the following testimony elicited by appellants' counsel:

"Q. Well, when did you first decide to sue Aerial Sprayers and Pitchfork? A. When we found out that's where the poison came from."

We also believe the abundance of circumstantial evidence pointing to the fact that the drift from the Pitchfork spraying settled on appellees' cotton was sufficient upon which to submit the questions to the jury; at least enough of the questions to sustain the jury's verdict. The record shows appellants had knowledge of the dangers involved in the application of herbicide by airplane, such warnings being shown by the State Department of Agriculture in bulletins. Mr. Burns recognized the danger by telling Mr. Humphreys to warn the pilot as to the wind if in the direction of the cotton farms and to be careful. Even the warning on the label of the poison used said: "Do not apply Esteron Ten-Ten directly to or otherwise permit it to come into contact with * * * cotton or other desirable plants which are sensitive to 2, 4–D and its formulations, and do not permit spray mists containing it to drift onto them, since even minute quantities of the spray may cause injury during both growing and Dormant periods."

The following warning on the label has dark heavy print: "Accordingly, applications by airplane, ground rigs and hand dispensers should be carried out only when there is no hazard from drift. Do not apply by airplane in the vicinity of cotton, grapes or other desirable 2, 4–D susceptible vegetation."

We now pass to the questions of admissibility of evidence. One of those points attacked the qualifications of Raymond King to give his opinion of the velocity of the wind on July 15, and another asserts the introduction of the weather reports of the Childress Weather Station was reversible error. We believe Raymond King's testimony was admissible under the same theory as the rule that permits people to testify as to their opinion of the speed of motor vehicles. He had listened to weather reports when he was out in the wind, as all of us do when we ride in automobiles and pickups with radios on. He had observed blowing conditions when the wind was at different velocities and we believe his testimony was clearly admissible. We believe it was also material in determining the wind velocity 7 to 10 miles away in China Draw on the Pitchfork.

In writing on the plea of privilege in this case, Aerial Sprayers, Inc. v. King, Tex.Civ.App., 317 S.W.2d 602, we held introduction of the United States Weather Bureau records of Childress 60 miles away, upon the direction and velocity of the wind went to the weight of the testimony and was not inadmissible under the circumstances. The weather was completely clear, the time was early morning in the middle of July in a dry year in West Texas where the terrain is similar. One of appellants' expert witnesses, Mr. Turner, whom the record shows was educated in British Columbia, Canada, and had no experience in Texas upon which to base his opinions testified that the velocity of the wind at Childress on the occasion in question was useless in determining its velocity at China Draw. He also told the jury that the wind could be blowing 20 miles an hour at the courthouse and that 5 miles away it could be still or 40 miles an hour. When such statements are applied to the conditions described on July 15, 1956, in the early morning at the time of the spraying

we believe the jury had the right to weigh their own experiences with such testimony in determining its believability. In any event, the introduction of the records was not reversible error when there was competent evidence on the same subject, to-wit: the testimony of Raymond King. Aerial Sprayers, Inc. v. King et al., supra, and the cases there cited.

 We now turn to appellants' contention that the testimony of the farmers and J. S. Mogford was insufficient to support the jury findings as to damages. The record shows Mr. Mogford holds a Master of Science degree from Texas A & M, where he was formerly Associate Professor of Agronomy; that his principal subject as an instructor was cotton production; that he had done additional graduate work at the University of Missouri; and that he had written text books concerning cotton production. He visited the Finney Community and inspected the cotton crops on four occasions, to-wit: August 14, September 5 and 28, and October 12. He made various boll counts and laboratory calculations upon which he established the loss sustained by each appellee. The farmers also gave testimony as to their opinion of the amount of loss they suffered. Some of them testified to little damages and the jury gave them little, some less than a hundred dollars. The 17 farmers on 22 farms were awarded a combined total of less than $10,000. We believe the evidence is sufficient to support the verdict of the jury and the judgment based thereon. We have in this case 1,363 pages in the statement of facts and approximately 150 exhibits. We have carefully read every word of testimony and examined all the legible exhibits. The points raised by appellants require us to consider whether the evidence preponderates against the verdict even though there is some evidence of probative force to support it. In re King's Estate (King v. King et al.), 150 Tex. 662, 244 S.W.2d 660. We have carefully considered and weighed all the evidence and after doing so do not believe we would be justified in saying the verdict is so manifestly unjust that the case should be sent back for a new trial.

Accordingly, the judgment of the trial court is affirmed.