Dr. Rhea **NICHOLS** d/b/a Grayson Hotel, Appellant,

v.

The **ACERS COMPANY**, Appellee.

No. 11501.

Court of Civil Appeals of Texas.

Austin.

May 17, 1967.

Rehearing Denied June 7, 1967.

Billings, Pierce, Gilley & Stanton, L. Vance Stanton, Dallas, for appellant.

Paul Brown, John D. Hill, Sherman, for appellee.

O'QUINN, Justice.

In this case a Dallas meat company sued for meats delivered to the food operation of the Grayson Hotel in Sherman during the months of July, August, and October, 1964. The suit was filed against Dr. Rhea Nichols, a medical doctor in Dallas, termed sole proprietor of the hotel and "doing business as Grayson Hotel."

The cause was pleaded as a sworn account, with invoice exhibits attached, and sworn to by R. A. Acers, one of the partners in The Acers Co., who brought the suit.,

Dr. Nichols answered denying that he purchased or agreed to purchase, or agreed to pay for, any of the items specified in the invoices attached to the petition. He further pleaded, in effect, that at the time the purchases were made in July and August he did not own or operate the hotel, and that in the month of October he was the owner but had the hotel leased out. The answer did not deny the claim under oath.

At the outset of the trial, Acers moved for judgment under Rule 185, Vernon's Ann.Rules Civ.Proc., for the reason that Dr. Nichols had not answered under oath. The court overruled the motion, and the parties proceeded to trial.

At the conclusion of the trial before the district court, without the aid of a jury, the court entered judgment for The Acers Co. in the amount of $1,461.90, for meat sold in the month of October, with interest from November 1, and attorney's fees for $487.31. Dr. Nichols has perfected appeal to this Court.

Appellant Dr. Nichols assigns two points of error, the first directed at the award of attorney's fees and the second challenging judgment on the account.

Dr. Nichols bought the Grayson Hotel in July, 1961, with the Merchants and Planters National Bank of Sherman financing the purchase, at least in part. Two years later, in July, 1963, Dr. Nichols sold the hotel to John Gilmartin, subject to the outstanding indebtedness to the original vendor and to the bank.

From July, 1963, when Dr. Nichols sold, until September 1, 1964, the hotel and the restaurant operated in connection with the hotel were managed and operated under Gilmartin. Sometime late in 1963 it appears that Gilmartin placed James E. Smith in charge of the hotel and its food service. About this time Smith started buying meat from The Acers Co., after being solicited by Roy Cobb, salesman for Acers.

Cobb testified that Smith kept the account current until the summer of 1964 when the account ran into trouble. July and August deliveries were not paid for, and later became a part of the sworn account sued on in this lawsuit.

Dr. Nichols reacquired the Grayson Hotel on September 1, 1964, from Gilmartin, and found Smith, whom he had never met before, in charge of the hotel and restaurant, acting for Gilmartin. At the time Dr. Nichols took over from Gilmartin, Smith and Dr. Nichols entered into an arrangement, evidenced by a written memorandum, by which Smith undertook to lease the hotel and restaurant from Dr. Nichols for $2,000 a month, effective the first day of September. The memorandum also recited intention of the parties to continue the lease arrangement or negotiate a sale of the hotel to Smith.

Smith paid the rent for September in advance by check, but the check did not clear the bank and was never paid. Smith continued in charge of the hotel and restaurant through September and until near the end of October, when Dr. Nichols assumed control of the hotel and its food service and put his own manager, Frank Berger, in charge. The last purchase of meat from Acers in October consisted of an order of strip sirloins, in the amount of $317.75, which Smith ordered for a party at the hotel on the night of Friday, October 27.

During the month of October, Smith conferred several times with Dr. Nichols as part of negotiations to buy the hotel. Smith apparently made efforts, without success, to obtain financial backing in the purchase. It appears that sometime during the weekend of October 28–30 Smith decided to give up his operation of the hotel and so advised Fred Holland, president of the bank, and Tip Newell, one of the lienholders.

Dr. Nichols was informed by telephone of Smith's intentions by Holland and Newell. Dr. Nichols was told that Smith was going

to sell the food inventory around town and leave the same day, unless Dr. Nichols agreed to buy the inventory. Through Holland and Newell, Dr. Nichols arranged to buy the food inventory from Smith for the sum of $2,234.82, which included some meat, and bought three stoves for $600.

Appellee filed suit grounded primarily on a sworn account, with nineteen invoices attached. This phase of the lawsuit embraced, in addition to claim of an account directly with Dr. Nichols, alternative claims of an account with an agent for Dr. Nichols, or an account with the agent subsequently ratified by Dr. Nichols.

In addition to the three alternative theories under sworn account, appellee pleaded four other theories of recovery: (1) violation of the Bulk Sales Act, (2) constructive trusteeship of accounts receivable, (3) reliance on promise by appellant's agent account would be paid, and (4) as third party creditor beneficiary of contract under which appellant acquired accounts receivable and inventory of the hotel.

No findings of fact and conclusions of law were made by the trial court, and apparently none was requested. If there is evidence to support the judgment on any theory of the case, the judgment of the trial court should be affirmed, and every issue raised by the testimony must be resolved in support of the judgment. 4 Tex.Jur.2d, Appeal and Error—Civil, sec. 747, pp. 244–5, and cases cited.

Appellee Acers contends that its suit, being on a sworn account, stood admitted by appellant at the outset of trial through his failure to deny the claim under oath, and that, under the ruling of the trial court, appellant was limited in his defense to proof only of matters in confession and avoidance. We cannot agree with these contentions.

We believe that appellee's theory of recovery under a sworn account fails and is controlled by the rule stated in McCamant v. Batsell, 59 Tex. 363. Under the facts of this appeal, Acers sold meat to Smith, lessee

of the hotel, and not to Dr. Nichols, the owner and lessor of the hotel. In the absence of a relationship between the parties under which Acers sold meat to Dr. Nichols and Dr. Nichols bought the meat, with title passing to Dr. Nichols, resulting in Acers becoming the creditor and Dr. Nichols the debtor in a general course of dealing, suit on a sworn account against Dr. Nichols may be defended without necessity of denying the claim under oath.

In McCamant v. Batsell, supra, Justice Stayton, speaking for the Supreme Court, said:

"It is not believed that a debt which is not the result of a transaction between the parties to it, and in reference to which they have equal means of knowledge, but which is the result of a transaction between one of them and some other person, can constitute such an account as the statute contemplates may be proved by the affidavit of a plaintiff, or as a defendant will be compelled to deny in whole or in part under oath, before he will be permitted to introduce evidence to disprove a prima facie case which the statute contemplates may be made by the affidavit." 59 Tex. 363, 370–371.

Continuing with this reasoning, Justice Stayton made the point, which is applicable in this case, that:

"The law does not permit, much less encourage, guesswork in swearing; and to require a defendant to swear that a transaction between a plaintiff and a third person, of which he may have no personal knowledge whatever, either did or did not occur in whole or in part, before he will be permitted to controvert the ex parte affidavit of his adversary, would be to encourage swearing without knowledge, which is morally perjury, or in some cases to forego a just defense, which might be clearly established under the well settled rules of evidence." 59 Tex. 363, 371.

The statute construed (Article 2266, R.S., 1879) in McCamant v. Batsell is a

direct forebear of Rule 185 and embodied the same requirements found in the rule. Rule 185 is a rule of procedure regarding evidence necessary to establish a prima facie right of recovery, or defense, and is not a rule of substantive law or the basis for a cause of action. Meaders v. Biskamp, 159 Tex. 79, 316 S.W.2d 75, 78, and cases cited.

In following the rule of McCamant v. Batsell, the courts have pointed out that the account, though verified, is hearsay as to parties in the position of appellant in this appeal. Appellant could not be expected to have personal knowledge of transactions between appellee and Smith. This affords the best reason that the verified answer mentioned in Rule 185 is not required. Duree v. Aetna Ins. Co., Tex.Civ.App., Amarillo, 66 S.W.2d 764 (no writ). Inasmuch as appellant was a stranger to the transactions between appellee and Smith, appellant may controvert and disprove the account upon which appellee sued, although appellant did not file a written denial under oath. Eng v. Wheeler, Tex.Civ.App., San Antonio, 302 S.W.2d 263 (writ dism'd); Robertson v. Rexall Drug and Chemical Co., Tex.Civ. App., Fort Worth, 410 S.W.2d 200 (no writ).

Appellee finds fault with the written agreement between Dr. Nichols and Smith, dated September 1, 1964, and argues that it does not constitute a lease. Presumably by this theory appellee expects to make Smith an agent or employee of Dr. Nichols in order to hold Dr. Nichols for the Acers account. The memorandum was admitted in evidence and was before the trial court for whatever probative value it might have in deciding the case. We do not find it necessary to determine whether a legally sufficient written lease of the hotel property resulted from the paper Dr. Nichols and James Smith signed September 1. The writing does serve to disclose the intent of the parties with regard to the question of who would be running the hotel after that date.

We believe it is clear that when Smith agreed to pay Dr. Nichols $2,000 a month for the hotel property, it was not Smith's understanding or intention that Dr. Nichols would start buying food supplies for the hotel or that Smith would be working for Dr. Nichols. Dr. Nichols testified that he leased the hotel to Smith and that Smith paid the first month's rent with a check, which later proved worthless, drawn by Smith on the "Smith Hotel Operating Account."

Dr. Nichols also testified that during the two months Smith was there he made several requests that Smith pay the rent, and Smith put him off until near the end of October, either October 31 or November 1, when Dr. Nichols "installed Mr. Berger into the hotel." If the memorandum signed September 1 was ambiguous or incomplete, and even if inadequate as an enforceable lease contract, the testimony of Dr. Nichols served to supply explanations and missing parts to show at least that the parties meant their relationship to be that of lessor and lessee and not one of employment or agency.

Consistent with the lease arrangement between Dr. Nichols and Smith is the evidence having to do with the purchase of meat for the hotel. Dr. Nichols testified that he never dealt with anyone from Acers, never ordered any meat, and did not authorize anyone to say that he would be liable for any portion of the charges. Roy Cobb, salesman for Acers, testified that he started selling meat to Smith late in 1963, when Smith was managing the hotel for Gilmartin, and continued selling to Smith during the months of September and October, 1964.

Although Smith let the July and August accounts go unpaid, Cobb testified that in September, after Smith had taken over from Dr. Nichols, Smith paid the meat account for September by check. Cobb testified that after Smith late in 1963 authorized purchases of meat for the hotel from Acers, the specific orders were arranged through

Jack Osborne, the chef working for Smith, and Smith paid the bills. This arrangement, with Smith's chef ordering the meat as needed, and Acers looking to Smith for payment, continued through September and October. Cobb regularly called by telephone every week about meat orders and called personally every other week. Thus he was continually in touch with the operation of the hotel. He testified that Smith continued after September 1 to manage the hotel until Smith left sometime after the last meat order given by Smith on October 27.

There is no evidence that Cobb, acting for Acers, had any dealings with Dr. Nichols. Cobb testified he did not see Frank Berger, the manager Dr. Nichols installed to succeed Smith, until after Smith left and Berger took charge about October 31. At that time all the purchases of meat, sued for on the account for October, were complete, and no new purchases from Acers were made until after November 1, and these Berger paid for in cash.

Appellee relies on the holding in Fairchild, Inc. v. M–P Cotton Felt Co., Tex. Civ.App., Fort Worth, 403 S.W.2d 527 (no writ), and argues that appellee's case was proved when appellant elected to go to trial without filing a sworn denial. Under the facts of the Fairchild case, plaintiff proceeded with proof of a sworn account, after defendant filed only an unsworn general denial, and offered evidence that the goods were sold to a third party, " * * * but under arrangements whereby such was to be done *upon the credit of the defendant and with the account and charges to be made and carried in the name of the defendant*" (Emphasis added). No such arrangement existed in the case at bar, and no claim is made that there was such an arrangement. Clearly, the cases are distinguished through this fundamental difference, and the Fairchild holding is not in point.

■ There is no evidence that Smith ever acted as the representative of Dr. Nichols.

If Smith had been an agent or employee of Dr. Nichols, it does not seem reasonable that he would have offered to sell the food inventory, which as agent or employee he would have known belonged to Dr. Nichols, and it would have been inconsistent with any such relationship for Dr. Nichols to buy the inventory he already owned.

■ Inasmuch as Cobb dealt only with Smith, or Osborne, Smith's chef, during September and October, and never with Dr. Nichols, there could have been no ratification by Dr. Nichols of an agent who never existed. Smith and Dr. Nichols obviously regarded their relationship as that of lessor and lessee, or landlord and tenant, and since neither of them was shown to have represented otherwise to anyone else, Acers was not entitled to deal with Smith as an agent of Dr. Nichols in selling meat for use at the hotel. Freiberg, Klein and Co. v. Beach Hotel and Seaside Improvement Company, 63 Tex. 449.

In the Freiberg case, goods had been sold to one Pierce, who "was in the apparent control of the Beach Hotel * * * which belonged to [the Beach Corporation], and these goods were bought by him for use in that hotel." The sellers sought to prove there was no lease, but that Pierce was agent for the hotel owner. The Supreme Court pointed out that a contract, by which Pierce was to manage the hotel owned by the Corporation and pay rent in the form of a percentage of gross receipts, on its face was a lease, an interpretation "aided and made certain by the fact that it was so treated by the parties thereto." The Court held that, this being the case, " * * * third parties could not insist upon a different and unauthorized construction in order to give them a right against one of the parties which was dependent wholly upon the relation which the makers of the agreement bore towards each other." 63 Tex. 449, 454.

We conclude that appellee was not entitled to recover against appellant under any of the three theories advanced under plead-

ings and evidence relating to the sworn account.

Appellee Acers pleaded the Texas Bulk Sales Act (Article 4001, Vernon's Ann.Tex. Civ.Stats.) and alleged that by buying the food inventory of the hotel coffee shop appellant became a receiver of the inventory acquired, particularly for the account owed to appellee by the hotel. Appellee did not pray for any relief except award of judgment for the account.

Consideration of whether the Bulk Sales Act is applicable in this case is limited to construction of the law as it read from 1961 to 1966, a period covering all transactions pertinent to this case.

■ The petition, on the theory of recovery under the Bulk Sales Act, is insufficient to require the trial court to proceed with a remedy under the statute. The petition must contain sufficient specific requests to indicate to the trial court the course the applicant for relief expects the court to follow, with a prayer that the court proceed along the course indicated. Gardner v. Goodner Wholesale Grocery Co., (Tex.Com. App., 1923), 113 Tex. 423, 256 S.W. 911. "To require less," the Court declared, "would be to substitute the voluntary action of the court for things which the law expects, and requires every litigant to do for himself."

The Bulk Sales Act, as last amended in 1961, was repealed effective June 30, 1966, when this subject matter was placed in the Uniform Commercial Code, sections 6–102 to 6–106. The language about the transferee becoming a receiver and being accountable to the creditors was not carried over into the Code, but the hope has been expressed by at least one writer on the subject that repeal of the old law without this language will not do' away with "the excellent body of remedial law developed in the Texas cases." University of Texas: Larson, Article 6 of the Uniform Commercial Code: Bulk Transfers, 44 Texas L.Rev. 661, 667 (1966). Among the cases considered by Larson as part of the excellent body

of remedial law is Gardner v. Goodner Wholesale Grocery Co., supra.

■ Prior to 1961 the Bulk Sales Act did not apply to the food inventory of restaurants, being similar to bakeries, ice cream factories, and other businesses buying raw materials for conversion to different form for sale. Daggett v. Wolff, Tex.Civ. App., Fort Worth, 44 S.W.2d 1063 (no writ). The law was amended in 1961 to include "meat and other edible foods furnished to restaurants, cafes, and cafeterias * * *." The Uniform Commercial Code does not include any phrase concerning restaurants and cafes, and comments of the drafters of the law indicate that restaurants are not covered by the new law, since restaurants fall into the group of businesses selling principally services and not merchandise.

■ To recover under the Bulk Sales Act, appellee had the burden to show itself clearly within provisions of the law in order to invoke its protection and benefits. This statute is in derogation of the common law and the right to alienate property without restriction, and for this reason should be strictly construed by the courts. Yeager v. Dallas Coffin Co., Tex.Civ.App., San Antonio, 69 S.W.2d 493 (writ dism'd); Axtell Co. v. Word, Tex.Civ.App., Austin, 29 S.W.2d 421 (no writ).

There is no evidence that Dr. Nichols bought any meat that Smith had bought from Acers. The last sale to Smith was on October 27, and it was a special purchase of strip sirloins ($317.75) to be used for a party that night at the hotel. The total purchases from Acers in October amounted to $1,461.90, but Smith was buying from three other meat companies and in October total sales to the hotel by the three other concerns amounted to $1,504.94. Dr. Nichols estimated that about half the food inventory he bought from Smith was meat, but there is no evidence showing whether any part of the meat on hand had been bought from Acers. It is not unreasonable to assume that the supply from Acers may have been exhausted, by Tuesday, October

31, since the special purchase of October 27 presumably was used for the party that night, and the following Tuesday, October 31, was Cobb's regular day to call on Smith for another weekly order to replenish the supply.

In Yeager v. Dallas Coffin Co., supra, the court made clear the duty of one seeking recovery under the Bulk Sales Act, and said with reference to the evidence required that, "Mere conclusions remotely inferable from isolated bits of testimony * * * do not meet the salutary rule requiring satisfactory evidence that a party has violated a statute so harsh in its restriction of the free right of barter and sale inherent in the citizen." 69 S.W.2d 493, 494, col. 2.

■ If the Bulk Sales Act was violated, Acers was not entitled to recover the amount of his entire account for October, but only for the value of his property, if there was any remaining, sold by Smith to Dr. Nichols on October 31 or November 1. Phillips v. Cargill, Tex.Civ.App., El Paso, 131 S.W.2d 775 (no writ), and cases cited 131 S.W.2d 775, 776, col. 2. In the absence of evidence that any meat Acers had furnished was included in the inventory sold, the trial court was powerless to afford appellee any relief on this theory of recovery.

■ It appears from the record that when Smith left around October 31 he owed Dr. Nichols $2,000 in rent for October. Dr. Nichols as the landlord was also a creditor and remained so, with a preference lien, even if purchase of the inventory contravened the statute and Dr. Nichols became a trustee for all the creditors. Settegast v. Second National Bank, 126 Tex. 330, 87 S.W.2d 1070, 102 A.L.R. 680.

Inasmuch as the last three of the seven theories of recovery pleaded by appellee relate to events beginning with October 31 or November 1, when Dr. Nichols took charge after Smith left, we will discuss these points together. The theories are that: (1) Dr. Nichols was a constructive trustee of the inventory and accounts receivable that Smith left, (2) Dr. Nichols' manager, Berger, told Acers' representative that Dr. Nichols would pay the meat account, and (3) appellee is a third party beneficiary of a contract between Smith and Dr. Nichols.

It was shown that on November 1 the hotel accounts receivable totaled $5,103.98 and the accounts payable incurred by Smith during his operations for September and October amounted to $14,611.61, not including taxes for 1963 and 1964 which had not been paid. Adding taxes, the payables amounted to more than $25,600. Dr. Nichols testified he was able to collect a portion of the receivables, but in the emergency of keeping the hotel in operation he was required to pay taxes and utility charges amounting to much more than the total receivables.

Cobb, Acers' salesman, testified that he first saw Berger, Dr. Nichols' manager, about noon, Tuesday, October 31, after Smith left. He said that Berger told him accounts receivable amounted to "between sixteen and seventeen thousand dollars," that every creditor would get his money, and that there were enough accounts receivable to take care of them. Cobb saw Berger next on November 20, and Berger then told Coob that enough money had not been collected to pay Acers. Berger told Cobb that Acers would have to wait and take its chances; that Acers might get paid and might not. Acers continued to sell meat to the hotel, under Berger's management, on a cash basis.

After an audit was made at the instance of Dr. Nichols, it was learned that the accounts receivable amounted to a little more than $5,100, only a portion of which proved collectible. By putting with these funds his own money, Dr. Nichols paid the back taxes for 1963 and 1964, in the amount of about $11,000, and brought the utility accounts current to prevent discontinuance of these services at the hotel. None of the receivables was used to pay Dr. Nichols his rent and Acers was not paid. It appears

that Dr. Nichols did not buy the accounts receivable from Smith and Smith made no assignment of the accounts to Dr. Nichols. The record discloses that Smith left the State upon surrendering the hotel and when last heard of was in West Virginia.

On the question of constructive trust, we conclude there is no evidence of contractual relations between Acers and Dr. Nichols, nor was there a fiduciary relationship, under which the doctrine may be applied. There had been no attempt to create an express trust that had failed for want of some formality, and there is no evidence of fraud or other wrong by Dr. Nichols.

 Actual or constructive fraud is an essential element in the creation or existence of a constructive trust. Appellee did not plead or prove fraud, actual or constructive, and there cannot be a recovery on this theory of the case. Talley v. Howsley, 142 Tex. 81, 176 S.W.2d 158. The law does not impress property, in this case chattels and choses in action, with a constructive trust since the trust is classified as belonging to remedial rather than to substantive law. McCabe v. Cambiano, Tex.Civ.App., Galveston, 212 S.W.2d 237 (no writ). In the McCabe case the court held "The frauds or wrongs for which the courts in the exercise of equitable powers will give relief by impressing a constructive trust, are such for which the courts in the exercise of their legal powers will give damages as compensation." 212 S.W.2d 237, 240, cols. 1–2.

We do not find facts in the record giving rise to a situation on which the doctrine of constructive trusts is applicable. See: Baylor University: Tigner, Trusts—Constructive—Requirements for Imposition, 25 Baylor L.Rev. 75 (1963), and Texas authorities cited and discussed by Tigner.

 In pleading that Dr. Nichols became obligated to pay Acers, growing out of the conversation between Cobb and Berger regarding sufficiency of the accounts receivable to pay all creditors, it appears that appellee sought to recover in promissory estoppel or detrimental reliance. The first conversation occurred October 31, Cobb testified, when Berger expressed what proved to be only his belief that the accounts receivable were adequate to pay Acers and the other creditors. Three weeks later, seemingly after the audit had been made, Berger told Cobb that Acers might or might not get paid because the accounts were inadequate. There is no evidence that Acers agreed to forbear suit, even if Berger's statement to Cobb on October 31 constituted a promise by Dr. Nichols to pay Acers, a finding we believe cannot be made under the facts. Mere omission to sue, without express agreement to forbear, is not consideration for a promise to pay. Wilkins v. Carter, 84 Tex. 438, 19 S.W. 997; Carter v. Wilkins, Tex.Civ.App., 29 S.W. 1102. See 13 Tex.Jur.2d, Contracts, sec. 54, p. 193.

There is no evidence Acers had threatened suit or "other legal remedies" when Berger expressed the belief that Acers would be paid. Within three weeks Acers knew payment could not be made and that it would have to take a chance on payment.

We conclude there is no support for the theory of recovery on a promise to pay, coupled with an agreement not to sue. We think there was no promise to pay, but if there was one, it was without the necessary consideration of an agreement to forbear suit.

 Under appellee's seventh and final theory of recovery, the claim is made that when Smith sold the food inventory to Dr. Nichols, their contract made Acers a third party creditor beneficiary. We find nothing in the record to indicate that either Smith or Dr. Nichols intended their contract to benefit anyone except the two of them. The burden would be on Acers to show that Dr. Nichols intended the contract to be for the benefit of Acers. It must be presumed that Dr. Nichols and Smith contracted for themselves, and in the absence of clear proof that they intended to benefit Acers, the contract must be construed as not made for the benefit of Acers. Citizens

National Bank in Abilene v. Texas and Pac. Ry. Co., 136 Tex. 333, 150 S.W.2d 1003. We find no support for this theory of recovery.

Since we conclude that appellee should not recover on any theory pleaded, and this case should be reversed and rendered, we do not find it necessary to consider appellant's assignment of error regarding award of attorney's fees by the trial court. Article 2226, Vernon's Ann.Tex. Stats., contemplates recovery of attorney's fees only if the claimant finally obtains judgment, and not for able, though unsuccessful, efforts of his counsel.

The judgment of the district court is reversed and rendered.

Reversed and rendered.