Garfield HORTON et al., Appellants,

v.

Martha Paxson HARRIS et
al., Appellees.

No. 1382.

Court of Civil Appeals of Texas,
Tyler.

Dec. 18, 1980.

Rehearing Denied Jan. 15, 1981.

William D. Perkins and Gilbert Spring, Lufkin, Samuel T. Biscoe, Dallas, for appellants.

Gordon Wellborn and Wellborn, Houston, Bailey & Perry, Glenn Perry, Henderson, for appellees.

MOORE, Justice.

This is a suit to cancel a deed or in the alternative to impose a constructive trust upon an 80-acre tract of land conveyed by appellants' ancestor, Eliza Horton, deceased, to appellee, Martha Paxton Harris, and her deceased husband, J. A. Harris. Appellants, who are the heirs of Woodson Horton and wife, Eliza Horton, both deceased, sought a cancellation of a deed dated January 28, 1952, executed by Eliza Horton, individually and as community survivor of the estate of Woodson Horton, deceased. As grounds for cancellation, appellants alleged fraud, undue influence, and lack of mental capacity on the part of Eliza Horton. Alternatively, appellants sought the imposition of a constructive trust and as grounds therefor alleged (a) appellee and her husband, J. A. Harris, deceased, were guilty of actual fraud, (b) constructive fraud, and (c) the breach of a confidential relationship which existed between Eliza Horton and the Harrises. Appellee answered with a general denial and affirmatively alleged that appellants' claim was barred by the five- and ten-year statute of limitations. Trial was before the court and a jury. In response to the special issues, the jury found that (1) Eliza Horton had sufficient mental capacity at the time she executed the deed, (2) appellee and those under whom she claimed held peaceable and adverse possession both under the five-year statute of limitations and under the ten-year statute of limitations. Pursuant to the jury's verdict, the trial court entered a take-nothing judgment against appellants, from which they perfected this appeal.

We affirm.

The record reveals that in 1903 Woodson Horton and wife, Eliza Horton, purchased the 80-acre tract of land which is the basis of this suit. In November 1918 the Hortons executed to the Mercantile firm of Mays and Harris (no relationship to the Harrises named in this suit) an instrument establishing a mechanic's and materialman's lien on 50 acres of the 80-acre tract to secure certain notes in the amount of $1,500.00 made for the purpose of constructing a house on the property. The notes were renewed by the Hortons many times and were still outstanding at the time of the death of Woodson Horton.

Sometime in the early 1930's Dr. W. E. Watkins, the father of appellee Martha Paxton Harris, became the Horton's family physician. Out of this relationship grew a practice whereby Dr. Watkins commenced grazing his cattle on the Horton land and in exchange he allowed the Hortons to keep the milk and butter by way of rent. This practice continued until Dr. Watkins' death in 1949. Thereafter, appellee Martha Harris and her husband, J. A. Harris, together with Myrtis Watkins, Mrs. Harris' sister, took over the management of Dr. Watkins' estate and continued the practice of grazing cattle on the Horton land under the same arrangement.

In 1951, Woodson Horton died intestate. Surviving him were his wife, Eliza Horton, and a son, John Horton. Also surviving him were the children of Alberta Horton Medford, his daughter, who died intestate in 1946.

Sometime before his death in 1949, Dr. Watkins employed John Horton as a farm laborer to work on another farm which he owned. After the doctor's death the Harrises, who continued to employ John as a farm laborer, would go to the Horton home and pick him up in the morning and bring him back in the afternoon. In January 1952, approximately three years after the death of Dr. Watkins and after the death of Woodson Horton, the firm of Mays and Harris notified John that they would no longer renew the mechanic's and materialman's lien note and advised him that they would foreclose and take possession of the land. Faced with this situation, John turned to Myrtis Watkins for help. Being financially unable to help him, Mrs. Watkins contacted Mr. and Mrs. Harris. The record is not clear as to what agreements, if any, were made as to what would be done. However, it appears that the Harrises assured John that they would do something so that John and the Horton family could continue to live on the property. Shortly thereafter, on January 9, 1952, John and his mother, Eliza Horton, appeared at the firm of Mays and Harris and renewed the mechanic's and materialman's lien notes, promising in the renewal instrument that the indebtedness due would be paid on October 18, 1952. On the following day, January 10, 1952, the record shows that Mays and Harris assigned the notes to J. A. Harris and his wife, Martha Harris, in consideration for the sum of $1,700.00. Martha Harris testified that after they decided to purchase the notes, they turned everything over to their attorney, Charles L. Williams, who thereafter handled the entire transaction. The record shows that on January 28, 1952, some eighteen days after the notes in question had been assigned to the Harrises, J. A. Harris, his attorney, Charles L. Williams (both of whom were deceased at the time of trial), D. L. Futch and S. R. Lerner went to the Horton home for the purpose of having Eliza Horton sign a deed to the property. The record shows that she executed a deed covering the 80–acre tract in question which conveyed title to J. A. Harris and wife, Martha Paxton Harris. Her signature was by her mark with D. L. Futch and S. R. Lerner acting as witnesses. The deed recites that Eliza Horton conveyed the land, individually and as community surveyor of the estate of herself and Woodson Horton, deceased, for and in consideration of the cancellation and surrender of the outstanding mechanic's and materialman's lien note which with interest amounted to $1,865.00. Immediately below the signature line on the deed containing her mark, the instrument recited "Eliza Horton, individually and as community survivor of the estate of herself and Woodson Horton, deceased." According to the undisputed testimony, shortly after the deed was executed J. A. Harris stated that the reason they purchased the property was so that John Horton and Eliza Horton would have a place to live for the remainder of their lives.

Martha Harris testified that some two or three years after Eliza Horton executed the deed, John talked to her about the transaction and she told him that if they ever decided to sell the farm they would give him or the Horton family the first chance at it but only during the life of John Horton. There is nothing in the testimony that

any of the Horton family ever offered to buy the farm from the Harrises.

On May 3, 1955, John Horton and his wife, Millie Horton, executed a tenancy agreement acknowledging that they were occupying the land as tenants at will of the Harrises. Eliza Horton died intestate in 1956. Thereafter, John continued to work for the Harrises until he fell ill approximately two years before his death and died intestate on July 22, 1967. Both John Horton and his sister, Alberta Medford, left large families who continued to live on the land until 1972 when the last of them moved away.

The record further shows that after the time the Harrises acquired the deed in January 1952, they asserted and claimed ownership of the property. They maintained the fences and mowed the pasture; they ran cattle on the property; they made improvements to the Horton home and built a barn on the property; they granted two right-of-way easements and executed an oil and gas lease; they exercised the granting of hunting rights; and they paid all state, county and school taxes on the property as the taxes became due. Insofar as the record shows no controversy ever arose as to the ownership of the property until this suit was filed in July 1975.

Appellants complain in their point of error of the action of the trial court in refusing to submit a series of requested special issues in connection with their theory of recovery on the basis of a constructive trust. It is their contention that the evidence was sufficient to warrant the imposition of a constructive trust and that the trial court erred in refusing to submit various special issues covering that theory of recovery. We find no merit in this contention and the point is accordingly overruled.

A constructive trust is a trust by operation of law which arises contrary to intention of in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equi-ty and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. 76 Am.Jur.2d *Trusts* sec. 221, p. 446. It is merely an equitable remedy imposed by law to prevent unjust enrichment resulting from unconscionable conduct. It may be imposed where actual fraud is apparent or where the conduct of one is so violative of good conscience that equity may deem it to be constructive fraud. Fraud, either actual or constructive, is a basic essential element before a constructive trust should be imposed. *May v. Little*, 473 S.W.2d 632 (Tex.Civ.App.—El Paso 1971, writ ref'd n. r. e.); *Nichols v. Acers Co.*, 415 S.W.2d 683 (Tex.Civ.App.—Austin 1967, writ ref'd n. r. e.); *Rogers v. Winn*, 329 S.W.2d 319 (Tex.Civ.App.—San Antonio 1959, writ ref'd n. r. e.). A confidential relationship coupled with a breach of a fiduciary obligation may constitute constructive fraud and give rise to a constructive trust. *Thigpen v. Locke*, 363 S.W.2d 247 (Tex.1962); *Fitzgerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256 (1951).

In the present case, the trial judge apparently concluded that the evidence did not raise a question of fact as to the existence of actual fraud, constructive fraud or constructive fraud based on a confidential relationship between the parties and therefore refused to submit special issues thereon. In determining whether that action was erroneous, we must follow the familiar rule of considering only the evidence and inferences arising therefrom which tend to establish the existence of a constructive trust. *Texas Employers' Ins. Ass'n v. Lockstedt*, 358 S.W.2d 718 (Tex.Civ.App.—San Antonio 1962, no writ); McDonald, Texas Civil Practice, sec. 12.08 (1970).

As grounds for the imposition of a constructive trust, appellants allege in their petition that it was represented to Eliza Horton that the instrument was not a deed, but was an extension of the mechanic's and materialman's notes, "or a lease or some other instrument." As further grounds for the imposition of a constructive trust appellants alleged that a constructive fraud was

perpetrated on Eliza Horton by the Harrises in falsely promising her that they would do certain acts in the future to see that the land was reconveyed to her or her children or grandchildren.

■ While appellants made such allegation in their petition, we find nothing in their brief discussing any testimony which would tend to support the submission of a special issue on either of the alleged grounds of fraud. Nowhere in their argument do appellants comply with Rule 418, Tex.R.Civ.P., by referring us to the page in the record where the evidence is to be found supporting the submission of such issues. Nevertheless, we have searched the record in vain and fail to find where either the Harrises or any of their agents or representatives made the alleged fraudulent representations to Eliza Horton either before or at the time she executed the deed in question. There is simply no evidence of active trickery or deceit in this record. There being no evidence such fraudulent representation, it follows that appellants were not entitled to a submission of such issues to the jury.

Appellants further argue that the court erred in refusing to submit their requested issues because there was some evidence of the existence of a confidential relationship between Eliza Horton and the Harrises and that their conduct in taking a deed to the property amounted to a breach of trust resulting in unjust enrichment. In our view the record likewise fails to support this contention.

The Restatement of Restitution defines the confidential relationship as existing "where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment or advice of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor." Restatement of Restitution sec. 182, Comment on Clause (b), p. 735. The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved. A mere subjective trust alone is not enough to transform a business transaction into a relationship of trust and confidence. *Thigpen v. Locke,* supra.

■ Taking the testimony as a whole and most favorably to appellants, we have concluded that there is not such evidence of justifiable trust and confidence as will create a fiduciary relationship.

In the present case there is very little evidence of any type of relationship between Eliza Horton and the Harrises after they took over Dr. Watkins' estate in 1949. While the evidence shows that Martha Harris had known the Hortons prior to the death of her father, there is no evidence that she or her husband ever had any close business or personal relationship with Eliza. After the death of Dr. Watkins, the Harrises kept up the same practice of grazing cattle on the Horton farm; however, there is no evidence that any new agreement was made at that time. While the testimony shows that Martha Harris saw Eliza often when she went to the home to pick up John and take him to work and back, there is nothing to show that Eliza reposed any trust and confidence in the Harrises. About the only thing in the record that could have caused her to place trust and confidence in the Harrises was that she knew that the Harrises made some arrangements so that she would not be evicted from her home. Actually there is no evidence that Eliza was privy to any of the discussions so as to lead her to rely on the Harrises, since the transaction was handled by her son, John. The only other dealings which the Harrises had with Eliza was when she executed the deed to them shortly after they became the assignees of the mechanic's and materialman's note. Insofar as the latter transaction is concerned, there is no evidence that the Harrises or their agents or representatives either did or said anything to justify Eliza in placing confidence in the belief that the Harrises would act in her interest. In connection with this transaction, the evidence shows only that Mr. Harris' attorney explained the deed to her and she signed it. In short, we find nothing in the record to suggest that Eliza,

as transferror, was accustomed to be guided by the judgment or advice of the Harrises. While Eliza no doubt had some type of relationship with the Harrises, we conclude that there is no evidence, other than testimony possibly showing Eliza's own subjective feelings, to show that her relationship with them was anything more than a debtor/creditor relationship. Further, we find nothing in the record showing that the Harrises were in fact unjustly enriched as a result of this transaction since there is nothing to show that the value of the property exceeded the amount paid by the Harrises. Accordingly, we overrule appellants' contention that there was some evidence to support the submission of an issue on the question of confidential relationship or trust and confidence.

■ We likewise overrule the contention that the trial court erred in refusing to submit special issues upon the question of whether the execution of the deed was a result of undue influence. Other than for a showing of a long-standing friendship, appellants offered no evidence except old age to support their claim of undue influence. It is settled that old age alone is not sufficient to establish undue influence. *Rothermel v. Duncan*, 369 S.W.2d 917 (Tex.1963). Appellants' second point is overruled.

We have already pointed out why we do not believe that there is any evidence to support the submission of special issues inquiring as to whether there was fraud in the inducement of the execution of the deed in question. Accordingly, appellants' third point is overruled.

Under points four through seven, appellants contend that there is no evidence or insufficient evidence to support the jury's answer to Special Issue No. 1, finding that Eliza Horton possessed sufficient mental capacity to execute the deed dated January 28, 1952.

■ It would serve no useful purpose to delineate the testimony adduced on the question of Eliza's mental competency at the time she executed the deed. Suffice it to say that we have carefully reviewed the record and find the testimony in this regard to be sharply conflicting. There being some evidence of probative force to support the finding the rule is so well settled that such a finding will not be disturbed on appeal that citation of authority is unnecessary. We are likewise of the opinion that there is no merit in appellants' contention that the evidence was insufficient to support the finding.

Under points eight through thirteen appellants contend that there is no evidence or in the alternative that the evidence is factually insufficient to support the jury's findings that the Harrises perfected title to the land under the five- and ten-year statute of limitations.

Before discussing these points, we think it appropriate to determine first whether appellee acquired title by virtue of the deed executed by Eliza Horton on January 28, 1952. If that deed was sufficient to convey title to the land in question, any discussion of the sufficiency of the evidence in support of the jury's findings concerning limitations title would be purely academic and unnecessary.

It has long been the established law in this state that a community survivor has the legal right to sell all community assets to pay community debts and the amount of the debt as compared to the value of the land sold is immaterial and it is likewise immaterial whether the survivor conveyed in his own name or as survivor. The survivor may sell community property, including the homestead, in payment of community debts. The survivor is not required to exhaust the personalty before selling the estate of the community. *Stone v. Jackson*, 109 Tex. 385, 210 S.W. 953 (1919); *Wilson v. Meredith, Clegg & Hunt*, 268 S.W.2d 511 (Tex.Civ.App.—Beaumont 1954, writ ref'd n. r. e.); 4 Texas Practice Land Titles, sec. 504, p. 397, et seq. (1961) and cases cited therein. In addition to the foregoing well-established rules, a presumption of fact exists that the sale by the survivor was made to pay community debts. *Davis v. Magnolia Petroleum Co.*, 134 Tex. 201, 134 S.W.2d 1042 (1940).

In the present case the undisputed proof shows the existence of a community debt secured by a mechanic's and materialman's lien on 50 acres of the 80-acre tract of land. In view of other positive proof showing that Eliza Horton, as community survivor, conveyed the land for the purpose of discharging community indebtedness, it is our view that the 1952 deed effectively conveyed the legal and equitable title to the Harrises to the exclusion of the Horton heirs, appellants herein.

Inasmuch as we have held that the deed was not subject to any of the infirmities set up by appellants and have also held that the record does not justify the imposition of a constructive trust, it becomes unnecessary to discuss the question of whether appellee also acquired title by virtue of the statutes of limitations.

The judgment of the trial court is affirmed.