H. L. McPHERSON, Appellant,

v.

J. C. BILLINGTON, Appellee.

No. 7541.

Court of Civil Appeals of Texas.

Amarillo.

Dec. 6, 1965.

Rehearing Denied Jan. 10, 1966.

Evans, Pharr, Trout & Jones, Lubbock, for appellant.

Brown & Shuman, Lubbock, for appellee.

CHAPMAN, Justice.

This is an appeal by H. L. McPherson, defendant below, from a judgment for J. C. Billington, plaintiff below, based upon a jury verdict.

Appellee sought and obtained recovery against appellant for the death of 365 swine and for reduced value of 46 others as a result of arsenic acid appellant permitted to pass over onto the pens enclosing the swine during an aerial spraying operation to

desiccate a cotton patch with such poison for another whose cotton was located within the same quarter-section of land and north of appellee's 40 acres. Appeal is perfected upon points which raise the no-evidence and great weight and preponderance of the evidence questions, error in the form of the issues submitted and error of the trial court in failing to give certain requested special issues.

The record explains that a desiccant such as arsenic poisoning kills only the leaves and stems, whereas some other chemicals kill the leaves and stalk, which is referred to as defoliating. However, some witnesses referred to the chemical as defoliating the cotton.

The first three issues inquired if appellant, while spraying cotton on the Caswell farm, * * * "permitted arsenic acid from his spray plane to pass over onto the hog pens of the plaintiff," then upon conditional issues if such action was negligence and a proximate cause of the damage to appellee's hogs. The first eight points are directed to the no-evidence and great weight and preponderance of the evidence questions and may be decided by us under the rules laid down by our Supreme Court in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, wherein that court spelled out in the following language the proper guide where the great weight and preponderance of the evidence question is raised:

"The question requires the Court of Civil Appeals, in the exercise of its peculiar powers under the constitution and Texas Rules of Civil Procedure Nos. 451, 453, and 455, to consider and weigh all of the evidence in the case and to set aside the verdict and remand the case for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some 'evidence of probative force' in support of the verdict."

It follows that appellee has a more onerous burden in sustaining the judgment where the great weight and preponderance of the evidence question is raised than where only the no-evidence question is to be considered because under the latter:

"To test the sufficiency of the evidence to determine if it will support the jury findings, we must give credence only to the evidence and circumstances favorable to the findings and disregard all evidence to the contrary, indulging every legitimate conclusion which tends to uphold such findings." Truelove v. Truelove, Tex. Civ.App., 266 S.W.2d 491 (writ refused).

Therefore, if in considering all the evidence, both favorable and contrary to the jury findings, we conclude such findings should be sustained, such conclusions would include the finding of lack of merit in appellant's no-evidence points. We shall, therefore, proceed to discuss the great weight and preponderance of the evidence questions.

Appellee testified that on or about the 29th day of October, 1963, he owned 411 hogs located on his 40 acres west of Lubbock; that along at the end of October, 1963, Mr. Caswell came by his place and asked him if he had seen "them" defoliating his cotton; that he had been gone and "they" did it yesterday or day before; that he first noticed his hogs getting sick * * * "sometime along the 29th or 30th of October, 31st, or something like that," which was the same day Mr. Caswell came out there; that they started dying; a majority died within two weeks, and within a period of 30 days all had died but 46; that from the day Mr. Caswell talked to him through Sunday, 147 of the animals died; that he took one into Dr. Rogers, a veterinarian, the afternoon after he talked with Mr. Caswell that morning; that he fed "the biggest bunch" of them in a trough 75 to 80 feet long and 6 feet wide at the top; that he had fed cooked garbage, bread, and kept

grain in the feeders; that they first started showing illness by diarrhea, vomiting, watering at the eyes, and staggering in their hind quarters; that all manifested similar symptoms; that he learned appellant had sprayed with a desiccant known as arsenic acid; that his hogs started dying at the same time the leaves on the Caswell cotton started dying; that the cotton on the Bill Avery land just south of his 40 acres desiccated just like the Caswell cotton and at the same time, even though Mr. Avery had not had it sprayed; and that it had not frosted at the time and did not frost until November 18.

Mr. Avery testified in effect that he had observed the Billington hogs before his cotton leaves dried up, that they were in good health, and that they started dying at the same time his cotton leaves died. He testified his cotton was late, he did not want it desiccated, and as a result did not even gather it.

Dr. Rogers made a post-mortem examination of the hog brought to him and testified it was emaciated, rather lifeless, had subnormal temperature, severe diarrhea, and was dehydrated. It had no appearance of enteritis or cholera, its greatest internal damage was in the intestinal tract and he submitted a specimen of the soft tissue, including the liver and kidneys, to a laboratory for testing. Dr. Rogers further testified that based upon the history of the animal, his observation, his post-mortem, the report of the laboratory technician and his professional training and experience, that in his opinion it was suffering from arsenic poison and would have died if he had not killed it for examination. He was supported in his diagnosis by the technician, who testified that a test of the liver and kidneys showed a * * * "strong positive test for arsenic at that time." Dr. Rogers also testified it would take only from 4 to 15 grains of arsenic to kill a hog.

Mr. Newman, an agronomist with the Texas Agricultural Experiment Station in Lubbock, with a master's degree and work on his doctorate, testified that arsenic acid produces one of the most severe kills as a desiccant. When asked about its tolerance when used in livestock feed, he testified that under instructions of the Pure Food and Drug Administration, when arsenic acid is used as a desiccant on cotton plants that if * * * "the seed from treated plants were harvested, and contained more than four parts per million on the surface of the seed, this seed could be confiscated and kept out of trade, because it would produce residue—produced arsenical residue in the oil, if it were squeezed to make cotton oil, or could contaminate the cotton seed hulls and meal." He also testified that swine are very sensitive to heavy metals which include arsenic and lead.

J. C. Miller, a district manager for an insurance company in Lubbock, testified that he was keeping some horses on a part of the Billington premises to the east of the hog pens at the time of the spraying of the Caswell cotton. He fed them regular processed horse feed and hay kept in a trailer covered with a tarpaulin and even then they "went off their feed" about the time the cotton leaves died and the hogs died and that for about a week they did not eat as they had been. He had two bred and tested quarter horse mares there at the time that had never failed to deliver their foals before and that failed to deliver the next year. He also testified he was reared on a farm, had raised hogs until he was 32 years of age and had never seen a nicer group of hogs, some registered, than Mr. Billington's animals before they became ill and started dying.

Appellee then called as a witness appellant H. L. McPherson, under the adverse witness rule. He testified in effect that he sprayed the cotton for Clarence Caswell on the farm immediately north of appellee's hog pens in October 1963 with a quart of arsenic acid per acre mixed in approximately three gallons of water; he knew the pens were there and knew swine generally stayed there; he knew the spray he used was a dangerous poison to animal life and the

containers it came in had such warning; that he started spraying about 8:00 a. m.; he used a practically new 235 h.p. Piper Pawnee with from 14 to 18 nozzles on each side through which the poison was ejected; that K. K. Kimbro was the pilot who did the spraying for him; that the nozzles had springs that were supposed to close when the main value closed but that minute particles of foreign matter could get under the nozzles and hold them open and that he had such trouble with that machine in 1964; that the pilot had to remember to pull the on-off switch at the end of each run to make a turn and if he forgot while traveling at the speed they used it would spray desiccant over a space of 133 feet in a single second; and that when they turned, the tail of the plane would swing in a wide arc toward the hog pens, which were 407 yards south of where he was spraying.

K. K. Kimbro, a employee of appellant, and who flew the plane upon the occasion in question, testified that the containers in which the arsenic acid is packed states it will drift; that the propwash from the tail of the plane would rock another plane behind it; that he flew from 85 to 95 miles an hour and that the propwash extends for as much as a quarter of a mile from the tail of the plane. He explained that the propwash was like a fan expelling air behind it.

The testimony shows by a meteorologist of the weather bureau at Lubbock that on October 29, 1963, the wind was southeast at 8 miles per hour at 8:00 a. m. and on October 28, 1963, it was 23 miles an hour from the north at 8:00 a. m. These velocities were measured at the airport north of Lubbock.

Captain Griffith, captain of the weather station at Reese Air Force Base, west of Lubbock, testified that at the base on October 28, 1963, the wind velocity at 0656 was northeast at 10 knots, 0757 northeast at 10 knots and 0855 northeast at 12 knots. He testified that on the 29th of October, 1963,

the wind at 0756 was southeast at 3 knots and that at 0855 south at 8 knots. The record shows that appellee lives on his 40 acres and that it is a mile east and 100 yards north of Reese Air Force Base, so the wind velocity and direction would appear to be more appropriate there than at the airport north of Lubbock.

On re-direct examination appellee testified that the basis of his telling his attorney that the spraying was done on the 28th rather than the 29th was what appellant said to him upon the occasion when he asked if his cotton had been sprayed. He also admitted on cross-examination that he testified in his deposition that it was about at the end of October, the 28th, 29th, or 30th.

Now, to determine if in considering all the evidence the verdict was against the great weight and preponderance thereof, we turn to that part of the testimony which could be considered favorable to appellant.

Between the hog pens and the sprayed cotton was a dormant alfalfa patch and east of that a wheat patch. A billy goat was located on the area where it could graze on either the alfalfa or wheat. The goat did not die but there is not any evidence as to whether he grazed the alfalfa and wheat during that time or not. If he was where he had access to the Miller horse's feed, which is not clear in the record, he could very well have lived on that for several days following the spraying operation. Hogs which were "running" on the alfalfa did die. Mr. Billington testified it was the season of the year that alfalfa had quit growing and that it rained a few weeks later and the wheat came out so he could graze it. He said the alfalfa came out the next spring. In any event, the evidence shows that arsenic does not kill the plant but only the leaves.

Mr. Kimbro testified positively that it was on the 29th that the cotton was sprayed, that it was approximately 8:00 a. m., "give or take 10 or 15 minutes either way," and it took only a short time to finish it.

Mr. George testified to being an experienced aerial sprayer and that when the plane is a foot to two feet above the cotton, 50 feet is the most he had seen it drift.

Mr. Henderson of Rowland Gordon, insecticide dealers, called as a witness for appellant, testified that he had sold appellee two pints of vitersol on September 11, 1963; that it contained some arsenic acid; that it is a vitamin product and is used to treat enteritis. He also testified on cross-examination that he sold it as a medicine and that it would not have killed the hogs.

When all the evidence, both favorable and contrary to the verdict is considered, we cannot say that the verdict is contrary to the great weight and preponderance thereof. These is a pattern of destruction, with the exception of the goat and perhaps the young wheat and dormant alfalfa patch, from the cotton patch sprayed, through the hog pens and onto the Avery cotton that was desiccated simultaneously with the desiccation of the Caswell cotton. The expert professional testimony shows the hogs died from arsenic acid poison. There is simply no good explanation of their death, except from the poison loosed into the atmosphere by the spraying operation and no explanation whatever of the desiccation of the Avery cotton except from the Caswell spraying. No other spraying operations were in effect in the area at the time the Caswell cotton was desiccated. Even admitting that the spraying was on the 29th, the wind velocity at Reese Air Force Base, only a mile away, was only 3 knots from southwest at 0756, the approximate time the spraying operation started. When the fact is considered that the force of the air from the propwash extends a quarter of a mile, that the tail of the plane on the turn was toward the hog pens each time and that they were less than a quarter of a mile away, the jury could very well have believed that one or more of the nozzles may have continued to spray at the 150-foot height on the turns because of a foreign particle lodged therein or that the pilot was late at times in cutting the spray off before making his upward movement and turn.

We therefore hold that none of the testimony favorable to appellant, when considered in connection with all the other evidence, is sufficient for us to hold that the verdict of the jury is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

Though not completely in point, partly because of the difference in the type of poison used, the following cases furnish some support for our conclusions: Schultz v. Harless, Tex.Civ.App., 271 S.W.2d 696 (N.W.H.); Aerial Sprayers v. Yerger, Hill & Son, Tex.Civ.App., 306 S.W.2d 433; Pitchfork Land and Cattle Company v. King, Tex.Civ.App., 335 S.W.2d 624 (affirmed as to Aerial Sprayers, 162 Tex. 331, 346 S.W.2d 598). In the last named case the Supreme Court affirmed a jury verdict against the spraying company where the evidence showed the damaged cotton for which recovery was sought was located from 7½ to 15 miles away from the scene of the spraying operations. In our case we have only a distance of 407 yards from the sprayed cotton to the pens where the swine were located and where 365 died from arsenic acid and the other 46 were sick.

█ If we understand appellant's Points 9 and 10 he has also challenged the form of submission of Special Issues 1 and 2 as being upon the weight of the evidence in assuming in Special Issue 1 that an arsenic acid did get onto the hog pens of appellee. We find no merit in this contention. In asking the jury: "Do you find from a preponderance of the evidence that H. L. McPherson, on or about October 28, 1963, while spraying cotton on the Clarence Caswell farm, permitted arsenic acid from his spray plane to pass over onto the hog pens of the plaintiff," the court properly placed the burden upon the one seeking recovery for such operation. The other two component issues on negligence and proximate cause were submitted conditionally in prop-

er form and made no improper assumptions in their submission.

Of course, there was no way to detect the poison as it was being consumed by the swine but the court charged on circumstantial evidence as follows: "A fact may be established by circumstantial evidence when the existence of it is fairly and reasonably inferred from the other facts proven in the case, if any." No objection is preserved to such definition by a point directed thereto in the brief.

■ In Point 11 appellant asserts error in refusing to submit his requested Issue No. 1 which inquired if the spraying on the Caswell farm was on the 29th day of October, 1963, only.

■ The requested issue denied was simply evidentiary, in view of the "on or about" submission. Rule 279, Vernon's Ann.Texas Rules of Civil Procedure, provides that when a case is submitted upon special issues the trial court shall submit the controlling issues made by the written pleadings and the evidence. Where the requested issue relates only to various shades of the issue submitted no reversible error is committed in the failure to submit the requested issue. Smith & Conklin Bros. v. Griffith, 153 Tex. 341, 268 S.W.2d 124; Thomas v. Billingsley, Tex.Civ.App., 173 S.W.2d 199 (writ refused); Texas & N.O. R. Co. v. Sturgeon, 142 Tex. 222, 177 S.W. 2d 264.

■ Additionally, the record shows appellant filed only a general denial to appellee's petition. A party is not entitled to an affirmative submission of an issue in his behalf where such issue is raised only by a general denial and not by an affirmative written pleading on his part. Rule 279, V.A.T.R.; Texas Employers' Ins. Ass'n v. Tate, Tex.Civ.App., 214 S.W.2d 877 (N. R.E.).

■ Even if it should be said there is no probative evidence of spraying on Oc-

tober 28th, a question we find unnecessary to pass upon, the point is still without merit. For a variance to be fatal it must be substantial, misleading, and prejudicial departure. Kleber v. Pacific Ave. Garage, Tex. Civ.App., 70 S.W.2d 812, 814 (writ dismissed). Our Supreme Court has even held that " * * * it is an elementary rule that, in proving the time at which a cause of action arose, the plaintiff is never confined to that laid in his declaration or petition." Gulf, C. & S. F. Ry. Co. v. Witte, 68 Tex. 295, 4 S.W. 490. The Texarkana Court of Civil Appeals has held that an allegation in a breach of contract suit that the dereliction occurred on or about the 13th or 14th of June was not error where the proof showed it occurred on the corresponding dates in July. Texas & N. O. R. Co. v. Weems, Tex.Civ.App., 184 S.W. 1103 (affirmed on other grounds, Tex.Com.App., 222 S.W. 972).

■ Requested Special Issue No. 2 which the court refused to give inquires if the wind was from a southerly direction when appellant sprayed the cotton on the 29th day of October, 1963. It is without contradiction in the record that the wind on the 29th of October, 1963, was from the south, southeast, or southwest at the period of time the cotton was being sprayed, if the 29th was the correct date. Additionally, it was an evidentiary issue and if answered in the affirmative could not have furnished the basis for a judgment for appellant in view of what we have said above with respect to the force of the propwash.

Requested Special Issue No. 3 inquired if the spray released upon the occasion in question was from the north of the most northerly part of the Billington property. That issue is uncontroverted, evidentiary, and if answered affirmatively, which it would have had to have been, could furnish no basis for a judgment for appellant.

Accordingly, the judgment of the trial court is affirmed.