**JON–T FARMS, INC., Appellant,**

v.

**GOODPASTURE, INC., Appellee.**

**No. 8720.**

Court of Civil Appeals of Texas, Amarillo.

June 13, 1977.

Rehearing Denied Aug. 8, 1977.

Prappas, Caldwell & Moncure, Brantly Harris, Houston, for appellant.

Crenshaw, Dupree & Milam, Cecil Kuhne and William R. Moss, Lubbock, for appellee.

ELLIS, Chief Justice.

Goodpasture, Inc., as plaintiff, instituted two consolidated breach of contract suits involving the purchase of grain from Jon-T Farms, Inc., the defendant. Jon-T Farms filed a counterclaim seeking recovery for grain delivered but not paid for. Judgment was rendered on a jury verdict favorable to the plaintiff. Goodpasture was awarded a total net recovery in the sum of $69,886.12, after deducting credits allowed on Jon-T's counterclaim, on one of the contracts. Neither party was awarded any recovery on the other contract.

Jon-T's appeal has raised various issues concerning: the nature of the alleged breach; alleged waiver of the breach; applicability of certain remedies for breach under the provisions of the Uniform Commercial Code; evidential support for damages awarded; manner of submission of special issues; and the counterclaimant's plea for statutory attorney's fees. We have concluded that the judgment of the trial court correctly disposed of the basic issues. Affirmed.

The first contract was dated January 17, 1973, and obligated Jon-T to sell Goodpasture 10,000,000 pounds of Number 2 yellow grain sorghum at $2.70 per hundredweight. Grades were to be "official" and the grain was to be shipped during October and November, 1973. Shipping terms were "FOB Cars West Texas TCP (Texas Common Point) Area." Payment was to be by drafts at a Houston bank. The second contract, dated July 24, 1973, obligated Jon-T to sell 5,000,000 pounds at $4.35 per hundredweight. Goodpasture recovered on only the first ($2.70) contract and it is the only contract involved in this appeal. Throughout this opinion, it will be referred to as "the contract."

In accordance with the contract terms, Jon-T began shipping the grain in October, 1973. By November 30 (the end of the stated delivery period), however, only 2,023,480 pounds of grain had been shipped. A shortage of rail cars had caused Jon-T's failure to complete delivery on time. Jon-T continued to ship grain, however, and Goodpasture encouraged these late deliveries. On December 8, 9 and 10, Goodpasture used its own trucks to transport twenty-four (24) loads of grain from Seminole to the railhead at Seagraves, Texas, where it was stored in Goodpasture's warehouse.

The evidence is undisputed that the price of grain began to rise subsequent to the execution of the first contract on January 17, 1973, and continued to rise until November of 1974, when it reached a price of $7.00 per hundredweight. On December 11 or 12, 1973, the market price was $4.48; in March of 1974, between $5.35 and $5.50; and in October or November, 1974, approximately $7.00 per hundredweight.

By a letter addressed to Goodpasture dated December 10, 1973, Jon-T stated that the contract had expired and that Jon-T would extend the contract through December, 1973 at a 60 cent per hundredweight upcharge. On December 13, Goodpasture suspended payments to Jon-T and (by Telex) ordered its employees to "Honor no more drafts on Jon-T until further advised." On the same day (December 13), Goodpasture's president visited with John Thomas of Jon-T. In that conversation, Jon-T was urged to honor the contract and was told that its drafts would be honored if discounts were allowed for non-conforming grain. One carload of non-conforming grain was released back to Jon-T on December 14.

This suit for breach of contract was instituted by Goodpasture on December 17, 1973. Jon-T attempted to draft on Goodpasture on December 19, but the draft was refused because discounts for non-conform-

ing grain had not been allowed. Although it paid no drafts thereafter, Goodpasture accepted and unloaded six (6) carloads of grain between December 10 and December 21. As of this last date, Jon-T had delivered 4,167,550 pounds of the 10,000,000 it had contracted to deliver. Goodpasture had paid for 2,205,660 pounds.

This case was tried to a jury in November, 1975. The jury found that Jon-T had breached and/or repudiated the contract, causing Goodpasture to sustain $121,179.84 in damages. This amount included $2,558.69 of incidental damages. Jon-T was allowed a set-off of $51,293.72 and judgment in favor of Goodpasture was rendered on the verdict for $69,886.12. Jon-T has appealed on fourteen (14) points of error.

In its first four points of error, Jon-T has argued that Goodpasture waived any breach of contract by Jon-T. Both parties agree that the contract was extended past November 30 and continued in effect at least until December 10. Jon-T has attributed this extension to Goodpasture's reinstatement of the contract after Jon-T breached the contract by failing to complete delivery on the contract by November 30. Goodpasture, on the other hand, has argued that there was no breach of the contract on December 1 because Goodpasture extended the time for delivery. Goodpasture was granted this option in the contract. It is our opinion that under the provisions of the contract, Goodpasture was entitled to extend time for delivery and that the evidence showed such an extension was given. Under either theory, however, the result is the same; the contract was in effect at least until December 10.

Goodpasture has argued that the letter sent by Jon-T on December 10 constituted a repudiation of the contract. According to comment 2 to section 2.610 of the Business and Commerce Code, repudiation occurs when one party declares his intention not to perform under the contract or declares that he will not perform except on conditions which go beyond the contract. Decisions rendered since the Code was enacted support this construction. *See, e. g.,*

*Laredo Hides Co., Inc. v. H & H Meat Products Co., Inc.,* 513 S.W.2d 210 (Tex.Civ. App.—Corpus Christi 1974, writ ref'd n. r. e.). The letter in question stated:

You are aware that Contract 16811 for 10,000,000 pounds expired in November. We will extend this contract through December, 1973 at $0.60 per cwt upcharge.

When given the "fair reading" suggested by Code comment 2, *supra,* this letter communicated an intention not to be bound by the contract and a demand for performance going beyond the terms of the original contract. In our opinion, this was a repudiation of the contract and the jury finding to that effect is supported by ample evidence.

Jon-T, however, has argued that a repudiation of an installment contract can be waived and the contract reinstated under Tex. Bus. & Comm. Code Ann. § 2.612(c). That statute provides:

(c) Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments.

It has been argued that Goodpasture's conduct constituted a waiver of Jon-T's repudiation as a matter of law.

We doubt that section 2.612(c) was intended to cover a repudiation such as this one. Comment 6 to that section states that this provision was not intended to cover true repudiation. Furthermore, Jon-T did not retract its repudiation as allowed by section 2.611.

In any event, Goodpasture's actions would not have amounted to waiver as a matter of law as Jon-T has suggested. After receiving Jon-T's December 10 letter of repudiation, Goodpasture refused to honor Jon-T's drafts. Such a suspension of performance is authorized specifically by Tex. Bus. & Comm. Code Ann. § 2.610, which provides:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(1) for a commercially reasonable time await performance by the repudiating party; or

(2) resort to any remedy for breach (Section 2.703 or Section 2.711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(3) in either case suspend his own performance or proceed in accordance with the provisions of this chapter on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2.704).

Goodpasture also demanded that Jon-T honor the contract. This, too, is authorized by section 2.610(2). Lastly, Goodpasture accepted six late shipments of grain. Accepting late performance does not constitute waiver of a breach as a matter of law. *See, e. g., Commercial Credit Corporation v. Taylor,* 448 S.W.2d 190 (Tex.Civ.App.—Tyler 1969, no writ). Furthermore, even if late acceptance raised a fact question as to waiver, no issue on waiver or reinstatement was requested and the argument cannot be asserted on appeal. Tex.R.Civ.P. 279; *Roberts v. Holmes,* 412 S.W.2d 947 (Tex.Civ. App.—Eastland 1966, no writ).

█ Jon-T has argued that Goodpasture waived its right to assert breach of contract because it accepted deliveries without reserving its rights under Tex. Bus. & Comm. Code Ann. § 1.207. That statute provides:

A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice", "under protest" or the like are sufficient.

It is recognized that the statute provides machinery for reserving contractual rights, but failure to do so does not compromise a party's position in later legal proceedings under the Code. The statute is permissive rather than mandatory. Tex. Bus. & Comm. Code Ann. § 1.207 comment 2.

We have concluded that the jury finding that Jon-T breached and/or repudiated the contract is supported by ample evidence and that Goodpasture did not waive the breach and/or repudiation as a matter of law. Points 1 through 4 are overruled.

In points 5 and 6, Jon-T has argued that two different types of grain inspection certificates which were admitted into evidence were incompetent as evidence that Jon-T delivered non-conforming grain to Goodpasture. The jury found that the grain delivered on December 8, 9 and 10 (i. e., the 24 truckloads hauled in Goodpasture trucks) was not all number 2 yellow grain sorghum as required by the contract. According to Jon-T, the inspections performed to grade the grain were not carried out according to the contract terms and the results of these inspections were incompetent as evidence under Tex. Bus. & Comm. Code Ann. § 2.513.

█ It is true that any method of inspection or grading specified in the contract should be presumed exclusive. Tex. Bus. & Comm. Code Ann. § 2.513(d). The contract, however, states only that grades are to be "official," with no further qualifications. In our opinion, the term "official" as used in the contract is ambiguous.

█ If a contract term has no one certain, definite meaning, it is ambiguous, and extrinsic evidence is admissible to determine the meaning that the parties intended it to have. *See, e. g., Ownens v. Neches River Municipal Water Auth.,* 514 S.W.2d 58 (Tex.Civ.App.—Tyler 1974, writ ref'd n. r. e.). In this case, extrinsic evidence was presented by both Jon-T and Goodpasture.

Jon-T argued that the only possible definition of the term "official" is the one found in the regulations promulgated under the United States Grain Standards Act, 7 U.S.C. § 71.

*Official grade.* The grade of grain as determined by official inspection personnel under the official grain standards. 7 C.F.R. § 26.1(b)(24).

If a load of grain is inspected according to this provision, the grade is certified with a "white certificate."

At trial, the "white certificates" were not produced to prove the grades of the 24 truckloads of grain shipped to Goodpasture. However, Goodpasture has contended that the method used to grade the grain resulted in an "official" grade within the meaning of that contract term.

■ To prove the grades of the 24 truckloads, Goodpasture produced "pink certificates." As with the white certificates, the procedure followed to obtain a pink certificate is prescribed in the Grain Standards Act. The only difference between the procedure followed to obtain a white certificate and that followed to obtain a pink certificate comes at the sampling stage. To qualify for a white certificate, the grain sample must be taken by someone who is licensed under the Grain Standards Act; for a pink certificate, unlicensed personnel take the sample. In both procedures, the actual grading is done by licensed personnel. The evidence indicated that so long as the sample taken is representative of the entire load, the results would be valid under either procedure. The pink certificates are denominated "Official Certificate." Three men involved in the grain trade (two Goodpasture employees and one inspector licensed under the Grain Standards Act) testified to the effect that both white certificates and pink certificates could be "official" grades.

In our opinion, there is ample evidence to support the trial court's implied finding that the grading procedure followed was "official" within the meaning of that contract term. The pink certificates introduced were competent evidence that Jon-T delivered non-conforming grain to Goodpasture.

Corroborating the results indicated by the "pink certificates" admitted by the trial court were grain inspection certificates issued by an inspector licensed under the United States Warehouse Act, 7 U.S.C. § 241. This man took samples from each of the 24 truckloads and graded the samples. Jon-T has argued that the results of this grading were inadmissible because the grading did not conform to the United States Grain Standards Act.

As above stated, the contract provided only that the grading be "official" and that term is ambiguous. The contract terms do not require or suggest that inspections and grading be according to the Grain Standards Act. In our opinion, the evidence supports the trial court's implied finding that these certificates represented "official" grading within the meaning of that contract term.

At trial, however, Jon-T produced evidence indicating that the inspector who graded the grain was not properly licensed when he did so. Goodpasture produced evidence that the inspector was actually licensed a short time before he graded the grain, but that he simply had not at that time received his written license. The trial court decided the issue favorably to Goodpasture and the evidence supports that finding.

We have concluded the evidence supports the trial court's findings that both the "pink certificates" and the certificates issued under the Warehouse Act represented "official" grading within the meaning of that contract term. For this reason, admission of the certificates was not error and points 5 and 6 are overruled.

■ It is the contention of Jon-T under its points 7, 8 and 9 that there is no evidence to support the jury's finding as to Goodpasture's damages. Jon-T asserts that Goodpasture pleaded and proved an incorrect measure of damages because it had effected the remedy of "cover" under § 2.712 of the Business and Commerce Code and that its basic recovery should be the difference between the cost of cover and the contract price. Jon-T further argues that Goodpasture submitted no evidence as to the cost of cover and thus was not enti-

tled to recover damages. Goodpasture contends that it was entitled under the provisions of § 2.713 of the Business and Commerce Code, to recover the difference between the contract price and the market price at the time it learned of the breach. It is undisputed that Goodpasture submitted evidence as to market value as of the time Goodpasture learned of the alleged breach.

Pertinent provisions of the Business and Commerce Code are:

§ 2.711.   Buyer's Remedies in General;

.   .   .

(a) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2.612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

(1) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

(2) recover damages for non-delivery as provided in this chapter (Section 2.713).

\*       \*       \*       \*       \*       \*

§ 2.712.   "Cover"; Buyer's Procurement of Substitute Goods

(a) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(b) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2.715), but less expenses saved in consequence of the seller's breach.

(c) Failure of the buyer to effect cover within this section does not bar him from any other remedy.   .   .   .

\*       \*       \*       \*       \*       \*

§ 2.713.   Buyer's Damages for Non-Delivery or Repudiation

(a) Subject to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter (Section 2.715), but less expenses saved in consequence of the seller's breach.

\*       \*       \*       \*       \*       \*

§ 2.715.   Buyer's Incidental and Consequential Damages

(a) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(b) Consequential damages resulting from the seller's breach include

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;   .   .   .

\*       \*       \*       \*       \*       \*

Comment 3 following § 2.712 states that the "buyer is always free to choose between cover and damages for non-delivery under the next section." (§ 2.713). Further, it is significant to note that comment 1 following § 2.713 states that "the general baseline adopted in this section uses as a yardstick the market in which the buyer would have obtained cover had he sought that relief." Also, "the crucial time is the time at which the buyer learns of the breach." In this connection, the Code presumes that the cost of cover will approximate the market price of the undelivered goods. *Kiser v. Lemco*

*Industries, Inc.*, 536 S.W.2d 585 (Tex.Civ. App.—Amarillo 1976, no writ).

Under § 2.712(c), upon seller's breach the buyer is not required to cover as a means of minimizing damages, and his failure to effect cover does not bar him from any other remedy. Thus, on seller's breach a buyer is free to choose between damages based upon the difference between the contract price and the cost of cover under § 2.712, and damages for non-delivery, consisting of the difference between the market price at the time when the buyer learns of the breach and the contract price under § 2.713(a). 64 A.L.R.3d 249; 67 Am.Jur.2d, *Sales*, 894.

Goodpasture pleaded and proved the measure of damages set forth in § 2.713. Jon-T has argued that testimony by William Long, a Goodpasture accountant, and Truitt Kennedy established that Goodpasture "covered" for the grain due from, but undelivered by, Jon-T.

The testimony of the plaintiff's witnesses, Long and Truitt, was that Goodpasture normally bought sufficient grain in order to meet its contracts for sale. There is no evidence that in Goodpasture's mode of operation it makes a specific purchase contract in order to meet the requirements of a specific sales contract. The company maintains "position" records as to its overall operation which disclose the total amount of grain it has contracted to sell and the total amount it has contracted to buy, and its "position" is maintained in order to fill its sales contracts. The contract entered into between Jon-T and Goodpasture cannot be said to have been entered into to fill any particular outstanding commitment. The grain purchased is commingled with other grain. Although in the overall operation Goodpasture may have bought some grain to compensate for the undelivered Jon-T grain to insure an adequate supply to meet its commitments, there is no testimony that Goodpasture went out and bought specific grain to make up for the specific amount of grain undelivered by Jon-T.

In fact, this record reveals that Goodpasture filed its suit within a week after learning of Jon-T's breach and, as was its right,

elected to seek the difference between the contract and market price, together with incidental and consequential damages. Goodpasture was not required to cover and there is no evidence of Goodpasture's purchase of grain for the purpose of cover during that week.

Nevertheless, Jon-T insists in its brief that Goodpasture covered in March or April, 1974, for the Jon-T shortage; however, we do not find any evidence of such specific purchases for such alleged cover set out in the record. In any event, had Goodpasture covered in March or April as contended, and if the cost of cover was equal or comparable to market price at that time, (considerably higher than market price in December, 1973) such procedure would have been quite detrimental to Jon-T's position in this matter.

In view of the foregoing, it is our opinion that the pleadings and evidence show that Goodpasture opted to pursue its remedy for damages, as it had the right to do, pursuant to § 2.713. Accordingly, points 7, 8 and 9 are overruled, and we hold that the proper measure of damages was applied in this case.

In its tenth point of error, Jon-T has argued that the trial court erred in submitting special issue # 1 too broadly. The issue was submitted in the following form:

1. Did Jon-T Farms, Inc., breach and/or repudiate Contract No. 16,811 ($2.70)? (Answer "Yes" or "No")

Tex.R.Civ.P. 277 vests the trial court with considerable discretion in submitting issues, and it is our opinion that the rule specifically authorizes this use of submission. *Members Mutual Insurance Co. v. Muckelroy*, 523 S.W.2d 77 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n. r. e.). Furthermore, broad submission of issues in non-negligence cases has always been permitted. *Union Mutual Life Insurance Company v. Meyer*, 502 S.W.2d 676 (Tex.1973). Under Rule 279, it is specifically provided that the trial court is to submit only controlling issues and " . . . the case shall not be

reversed because of the failure to submit various phases or different shades of the same issue." In this connection see: *Holmes v. J. C. Penney Company*, 382 S.W.2d 472 (Tex.1964); *McPherson v. Billington*, 399 S.W.2d 186 (Tex.Civ.App.—Amarillo 1965, writ ref'd n. r. e.). It is our opinion that the trial court submitted the ultimate and controlling issue as to whether the defendant breached and/or repudiated the contract and other phases or shades of such issue were not necessary or proper. We find no error in the form in which the issues were submitted here. Point 10 is overruled.

Jon-T's eleventh point attacks the trial court's judgment because the verdict lacked a finding that the breach and/or repudiation by Jon-T went to the whole of the contract. The gist of this argument is that Tex. Bus. & Comm. Code Ann. § 2.711 authorizes damages for breach only as to goods involved or as to the whole contract if the breach goes to the whole contract. The issues submitted to and answered by the jury did not inquire whether the breach went to the whole. Jon-T made a request for such an issue, but the request was denied.

██ Although Jon-T requested the issue, it did not object to its omission. Under Tex.R.Civ.P. 273, 274, 276 and 279, a party must object to the failure to submit an issue relied upon by the other party. *Lyles v. Texas Employers' Insurance Association*, 405 S.W.2d 725 (Tex.Civ.App.—Waco 1966, writ ref'd n. r. e.). A request will not substitute for an objection and for this reason, Jon-T cannot raise the issue on appeal.

██ Furthermore, when Jon-T requested the issue, it was included among 67 other requested issues and 23 requested instructions. Many of these issues and instructions were shades of the ones actually submitted by the trial court. Our rules of civil procedure specifically declare as untenable the practice of a party obscuring or concealing a meritorious request for an issue with a large number of unfounded objections, minute differentiations or numerous unnecessary requests. *See,* Tex.R.Civ.P. 274.

We hold that for this reason, Jon-T waived its right to raise the issue. *Edwards v. Gifford*, 137 Tex. 559, 155 S.W.2d 786 (1941); *Metal Structures Corp. v. Plains Textile, Inc.*, 470 S.W.2d 93 (Tex.Civ App.—Amarillo 1971, writ ref'd n. r. e.).

██ Even assuming Jon-T had not waived this argument it is our opinion that the trial court's failure to submit the issue requested was not error. It is clear that Jon-T's repudiation went to the whole of the contract and the matter was not issuable. *Wright v. Vernon Compress Co.*, 156 Tex. 474, 296 S.W.2d 517 (1956).

In points 12 and 13, Jon-T has argued that there is no evidence to support the jury's award of $2,558.69 in special damages to Goodpasture. This amount represented expenses incurred by Goodpasture in transporting 24 truckloads of grain from Jon-T's elevator in Seminole, Texas, to Goodpasture's warehouse at Seagraves, Texas. The terms of the contract were "FOB West Texas TCP Area." Under these terms, Jon-T was obligated to pay all expenses involved in loading the grain on rail cars for shipment.

After it became apparent that the rail car shortage would impede grain shipments, the parties entered into an oral "arrangement" under which some of the grain would be transported in Goodpasture trucks. This arrangement is the type of substitute performance contemplated by Tex.Bus. & Comm.Code Ann. § 2.614. That statute obligates a seller to use and a buyer to accept delivery by commercially reasonable means if the agreed method of transportation becomes impracticable. This was done by the parties, but the substitute transportation involved extra expense and the statute does not settle the question as to who should bear this expense.

██ We have concluded that Jon-T should bear the extra expense in this case. Under the terms of the contract, Jon-T would have had to bear the expense of transporting the grain from its elevator to a railhead for loading. Goodpasture was required to transport the grain to a nearby

railhead for storage and the expenses incurred would not have been incurred by Goodpasture if Jon-T had performed according to the contract terms.

The appellant makes reference to the testimony of Mr. Goughnour, a Goodpasture employee, who testified concerning the making of arrangements for some trucks and stated that certain trucks were made available "at our expense." Apparently, this testimony was construed to mean that Goodpasture initially incurred the expense, but not to mean that Jon-T was relieved from his obligation to bear the transportation expenses as agreed under the terms of the contract. Certainly, the written contract did not obligate Goodpasture to bear this expense.

It is our opinion that there is ample evidence to support the $2,558.69 award for special damages. Points 12 and 13 are overruled.

In its last point of error, Jon-T has complained of the trial court's action in sustaining a special exception to Jon-T's claim for attorney's fees and has prayed that the issue of attorney's fees be severed and remanded. Jon-T's claim for attorney's fees is founded upon Article 2226, V.A.C.S. (Supp.1976), which provides:

> Any . . . corporation . . . having a valid claim against a . . . corporation for . . . material furnished . . . or suits founded upon a sworn account or accounts, may present the same to such persons or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, the claim has not been paid or satisfied, and he should finally obtain judgment for any amount thereof as presented for payment to such persons or corporation, he may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees.

Goodpasture's special exception sustained by the trial court set out that "such attorney's fees and such claims are not recoverable as a claim for an account and attorney's fees are not recoverable, such sums being alleged to be due under a special contract, or contracts, are not covered and not within the purview of Art. 2226." Jon-T has argued that its claim was for "materials furnished" within the meaning of the statute and that it is entitled to attorney's fees even though the basis of its claim is contractual.

It has been established that a suit for statutory attorney's fees as a separate action under Article 2226 cannot be maintained, and before recovery of attorney's fees may be had thereunder, the claimant must prevail in its underlying action against the adverse party, and that severance of the claim for attorney's fees is error. *National Surety Corporation v. Standard Concrete Pipe Sales Company*, 366 S.W.2d 103 (Tex.Civ.App.—Houston 1963, no writ). *See also, Huff v. Fidelity Union Life Insurance Company*, 158 Tex. 433, 312 S.W.2d 493; *Nichols v. Acers Company*, 415 S.W.2d 683 (Tex.Civ.App.—Austin 1967, writ ref'd n. r. e.); *National Homes Corporation v. C. J. Builders, Inc.*, 393 S.W.2d 949 (Tex.Civ.App.—Houston 1965, writ dism'd). In the light of the foregoing, it is our opinion that since judgment in favor of Goodpasture in the net sum of $69,886.12 has been sustained in this case against Jon-T, the issue as to attorney's fees may not be severed and remanded as prayed for by the appellant.

Furthermore, it has been held that where both litigants have presented claims for damages, i. e., one party brought suit on its claim and the other party counterclaimed, the party recovering the lesser amount is not entitled to recover attorney's fees under Article 2226. *L Q Motor Inns, Inc. v. Boysen*, 503 S.W.2d 411 (Tex.Civ.App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.). As noted above, the trial court's judgment awarded Jon-T no net recovery from Goodpasture because the amount awarded to Goodpasture exceeded that awarded to Jon-T. Our holding sustaining the award of damages would preclude the awarding of attorney's fees to Jon-T under Article 2226 and is dispositive of that issue in this case. We therefore do not here pass upon the

various contentions of the parties relevant to the special exception concerning attorney's fees referred to in the fourteenth point.

For the reasons above stated, the judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING

We have carefully reviewed and considered the various matters raised in appellant's motion for rehearing as well as its brief submitted in support of such motion. We have determined that our opinion, as previously issued, reflected our views with respect to the appellant's various challenges of the trial court's legal conclusions as well as the evidential support for the jury's findings regarding those legal and factual determinations deemed basic or controlling in the disposition of this appeal.

As a part of the appellant's motion for rehearing, the appellant requested this court to make and file supplemental findings of fact. We have examined such requests and have determined that our conclusions on controlling issues of fact were sufficiently stated in our opinion heretofore issued, and that certain findings requested were evidentiary or argumentative in nature and involve original findings which we are unauthorized to make. *See City of Beaumont v. Graham*, 441 S.W.2d 829 (Tex. 1969). A court of civil appeals is authorized only to "unfind" facts. Id. 833. The appellant's requests for supplemental findings of fact are denied.

After considering all matters set out in appellant's motion for rehearing, we adhere to our former disposition of the case. Accordingly, appellant's motion for rehearing is overruled.